IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
MARCH 1999 SESSION

FILED

October 18, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **BOBBY R. WILCOXSON,** | * | C.C.A. No. 03C01-9804-CR-00134 |
| Appellant, | * | HAMILTON COUNTY |
| vs. | * | Hon. William H. Inman, Senior Judge |
| **STATE OF TENNESSEE,** | * | (Post-Conviction) |
| Appellee. | * | |

For Appellant:

James E. Brenner
Clark Hill P.L.C.
500 Woodward Avenue
Suite 3500
Detroit, Michigan 48226-3435

William C. Carriger
Strang, Fletcher, Carriger,
Walker, Hodge & Smith
400 Krystal Building
One Union Square
Chattanooga, Tennessee 37402

For Appellee:

John Knox Walkup
Attorney General and Reporter
425 Fifth Avenue North
Nashville, TN 37243-0493

Kenneth W. Rucker
Assistant Attorney General
Criminal Justice Division
425 Fifth Avenue North
Nashville, TN 37243-0493

OPINION FILED: _____

AFFIRMED

NORMA MCGEE OGLE, JUDGE

## OPINION

On November 1, 1986, the petitioner, Bobby R. Wilcoxson, was convicted in the Hamilton County Criminal Court of first degree murder and, on February 13, 1987, was sentenced to death by electrocution. On direct appeal, the Tennessee Supreme Court affirmed the petitioner's conviction and death sentence. State v. Wilcoxson, 772 S.W.2d 33 (Tenn. 1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1798 (1990). The petitioner's counsel then filed a petition for post-conviction relief on June 14, 1990, which petition was amended on February 7, 1992, and on March 31, 1997.[1] Following an evidentiary hearing, the post-conviction court denied the petitioner relief from his conviction, but reversed the petitioner's death sentence, finding that the petitioner had received ineffective assistance of counsel during the penalty phase of his trial. The State now concedes that the petitioner is entitled to a new sentencing hearing.[2] However, the petitioner appeals the post-conviction court's denial of relief from his conviction.

---

[1]On March 21, 1994, the petitioner filed, pro se, a motion to dismiss the petition for post-conviction relief. He alleged that his post-conviction counsel, James E. Brenner, had filed the petition without his authorization. On March 24, 1994, the State filed a motion for a hearing concerning the petitioner's motion to dismiss his petition. On April 15, 1994, petitioner's counsel filed a response in opposition to the aforementioned motions, alleging that the petitioner was incompetent and noting that defense counsel had filed an ex parte motion for expert assistance from a psychiatrist and/or psychologist and for investigative support. On June 28, 1994, the post-conviction court ordered that the State evaluate the petitioner in order to determine his competence to submit his pro se motion. Additionally, on August 12, 1996, pursuant to the ex parte motion filed by petitioner's counsel, the post-conviction court also appointed Dr. Gillian Blair, a licensed clinical psychologist, to examine the petitioner.

Subsequently, at the post-conviction evidentiary hearing, the State challenged the instant petition, arguing that the petitioner had not signed the petition nor authorized its submission and that the petitioner was competent to withdraw the petition. The State cited Tenn. Code. Ann. § 40-30-102 (1990), which provides that "[a] *prisoner* . . . may petition for post-conviction relief." (Emphasis added). In response, defense counsel represented to the court that he had filed the instant petition with the permission of the petitioner and again asserted that the petitioner was incompetent.

Following the parties' presentation of proof, the post-conviction court noted that Sup. Ct. Rule 28, § 5 (E)(2) was not in effect when the instant petition was filed and concluded that the petition was properly filed and, additionally, that the petitioner was not competent to withdraw his petition. The State does not contest this determination on appeal.

[2]The State filed a notice of appeal from the post-conviction court's judgment reversing the petitioner's death sentence and granting the petitioner a new sentencing hearing. However, on June 16, 1998, the State filed a motion to dismiss its appeal. This court granted the State's motion on July 13, 1998.

2

On appeal, the petitioner presents the following issues for our review:[3]

1. Whether petitioner's trial counsel rendered ineffective assistance during the guilt/innocence phase of his trial in failing to adequately investigate the petitioner's competence to stand trial and the feasibility of an insanity defense or a claim of diminished capacity.

2. Whether petitioner's trial counsel were also ineffective during the guilt/innocence phase for the following reasons:
   a. Failure to request and obtain adequate expert and investigative assistance;
   b. Failure to investigate and present all available evidence supporting the petitioner's claim of innocence;
   c. Failure to rebut the State's case;
   d. Failure to object during voir dire to the exclusion of jurors opposed to capital punishment;
   e. Failure to exclude those jurors whose views would prevent or substantially impair the performance of their duties;
   f. Failure to adequately advise the petitioner concerning the option of testifying during his trial;
   g. Failure to object to the trial court's instruction to the jury on reasonable doubt;
   h. Failure to allege ineffective assistance of counsel in the motion for new trial and on direct appeal;
   I. Counsel's withdrawal from the petitioner's case during direct appellate proceedings.

3. Whether the petitioner was denied his constitutional right to a speedy trial.

4. Whether the petitioner was denied his statutory right to be tried within one hundred and fifty (150) days following his arraignment.

5. Whether the trial court erroneously excluded jurors due to their opposition to capital punishment.

6. Whether the trial court erred by instructing the jury concerning the offense of accessory before the fact, despite the omission of this offense from the indictment.

---

[3]In his brief, the petitioner generally refers the court to his amended petition for post-conviction relief, Sections No. 16, (h) through (r), and No. 17, (a) through (k). These sections include issues relating to the petitioner's death sentence. These issues are moot due to the post-conviction court's reversal of the petitioner's death sentence and the State's withdrawal of its appeal. Accordingly, we do not address issues relating to the petitioner's death sentence in this opinion.

7.  Whether the trial court's instructions to the jury were inaccurate and confusing and thereby misled the jury.

8.  Whether the trial court improperly denied the petitioner's pretrial and post trial motions, including the petitioner's motion for a speedy trial, motions for exclusion of evidence, and motion for new trial.

Following a thorough review of the record and the parties' briefs, we affirm the judgment of the post-conviction court.

## I.  Factual Background

### A.    Trial Proceedings

The petitioner's conviction resulted from the contractual killing of Robert Mosher in 1982.  At the time of his death, Mr. Mosher lived in Signal Mountain, Tennessee, with his wife and daughter and was a chemical engineer with the DuPont Company.  On October 23, 1982, his body was discovered in the garage of his home.  A piece of plastic had been forced, possibly with a broom handle, eight to ten inches down Mr. Mosher's throat, causing trauma to his pharynx, larynx, and vocal chords and causing his death by suffocation.  Mr. Mosher additionally suffered lacerations on his forehead, around his mouth, on his upper left arm, and on his back.  Mr. Mosher's assailants ransacked his home, but apparently did not steal any property from the home.

Following Mr. Mosher's murder, police investigators were unable to locate any evidence concerning the identity of the perpetrator or perpetrators of the murder.  In fact, Mr. Mosher's wife, Evelyn Mosher, refused to speak with the police following initial interviews.  However, in 1985, Mr. James Lewis, a convicted murderer and thief on parole from a federal penitentiary, approached the police with information concerning Mr. Mosher's murder.  Mr. Lewis believed that the United States Parole Commission would soon revoke his parole and offered his assistance

4

in return for favorable recommendations to the Parole Commission. Also in 1985, pursuant to a search warrant obtained while investigating drug activities by Mrs. Mosher, the police acquired Mrs. Mosher's address book. The address book contained the telephone numbers of the petitioner and his brother, "Cole" or "Green Eyes."

On December 19, 1985, a Hamilton County Grand Jury indicted the petitioner for the premeditated first degree murder of Robert Mosher. The petitioner's trial commenced on October 28, 1986. The State's evidence revealed that, prior to Mr. Mosher's murder, the Moshers began to experience marital difficulties when Evelyn Mosher began using and selling drugs in their Signal Mountain home. The State's evidence further revealed that, in connection with her illicit drug trafficking, Mrs. Mosher met Mr. Lewis and, on several occasions, attempted to hire him to kill her husband. Mr. Lewis declined the offer.[4]

In early 1982, the petitioner was released on parole from the federal penitentiary in Leavenworth, Kansas. The petitioner was to serve his parole in the Chattanooga area of Tennessee and spoke with Mr. Lewis, who was a prior acquaintance. Mr. Lewis suggested that the petitioner contact Evelyn Mosher. However, he warned the petitioner that Mrs. Mosher might attempt to hire him to kill her husband. The petitioner responded, "I don't know about that, but if she hires me, she'll get the meanest son-of-a-bitch she's ever seen in her life."

The State argued at trial that Evelyn Mosher did, in fact, hire the petitioner and his brother, "Green Eyes," to murder her husband and also asked that

---

[4]At the time of Mr. Mosher's murder, Mr. Lewis was incarcerated in the federal penitentiary in Leavenworth, Kansas.

her husband's death appear to be accidental in order to increase any insurance proceeds. The State also asserted that the Wilcoxsons accepted the contract to kill Mr. Mosher. Specifically, the State posited that, on October 23, 1982, the Wilcoxsons attempted to kill Mr. Mosher by pushing him from a ladder, later found leaning against the sink in the kitchen of the Mosher home. However, Mr. Mosher struggled, and the Wilcoxsons beat and suffocated him instead. They then ransacked Mr. Mosher's home in order to create the impression that Mr. Mosher had been attacked by burglars. As a result of her husband's murder, Mrs. Mosher received two hundred and nine thousand and two hundred and seventy dollars and eighty cents ($209,270.80) in insurance proceeds.

The State's key evidence at trial was a conversation between the petitioner, Mr. Lewis, and Eddie Cooper, an undercover police officer, which occurred on December 14, 1985, and was recorded by the police. During this conversation, Mr. Lewis sought to hire the petitioner to commit a murder in Atlanta, Georgia. While discussing payment arrangements for the proposed murder, the petitioner also discussed Mrs. Mosher's failure to pay him pursuant to a prior contract. When asked why he had agreed to "kill her old man" without demanding payment in advance, the petitioner replied, "Well, I - - it's a fluked up deal." He indicated that Mrs. Mosher had only paid "expenses coming in." The petitioner denied "bugging" Mrs. Mosher about the money. He stated, "I've asked her about it, but there's a difference between asking and bugging."

Mr. Lewis indicated to the petitioner that he felt responsible for the "fluked up deal" because he had introduced the petitioner to Mrs. Mosher. He offered to pay the petitioner an additional amount of money for the current contract in order to compensate him for the Mosher murder. During the conversation, the

6

petitioner remarked, "Well, if you could just spare some cash on it, fine.  Because I owe the other boy . . . .  I'll pay the other boy his half of that one on Evelyn [Mosher] and I'll just forget mine."

The petitioner subsequently suggested that "the other boy" is his brother, "Green Eyes."  Moreover, during the conversation, the petitioner recounted details of the Mosher murder to Mr. Lewis:

> [Evelyn] said that it would be so and so and so and so,
> and when the man went down to hit him, the man
> stepped off the ladder, and you have to have the weight
> of his body falling to break his neck. . . . And then he put
> up a goddamn . . . struggle, and . . . he said that he
> would be wasted, and the mother fucker was wasted,
> see. . . .  Double indemnity if it'd been an accident.

At another point in the conversation, the undercover officer asked, concerning the current contract, "Can you assure me that it won't be botched like Evelyn's old man?"  The petitioner replied, "That job wasn't botched.  He was dead.  That's all it called for."

The petitioner's case consisted solely of testimony establishing that his blood type did not match two different blood types found at the scene of the crime.  The petitioner's counsel argued in closing that Mr. Mosher had been murdered by someone other than the petitioner and his brother, possibly drug trafficking associates of Evelyn Mosher.  They conceded that the petitioner was aware of the circumstances of Mr. Mosher's death.  However, they noted that the petitioner knew Evelyn Mosher and could have obtained the information from her.  They further asserted that any incriminating statements by the petitioner during the recorded conversation with Mr. Lewis and the undercover officer stemmed from the petitioner's intoxication at the time of the conversation and the immediate prospect of being paid twelve thousand and five hundred dollars ($12,500) in advance for the

7

proposed Atlanta, Georgia murder. Trial counsel emphasized that, during the recorded conversation, the petitioner never explicitly confessed to the Mosher murder.

At the conclusion of the proof and after fifty-two minutes of deliberation, the jury found the petitioner guilty of first degree murder. The petitioner's sentencing hearing commenced immediately following the jury's verdict. However, during the course of the penalty phase of the petitioner's trial, the petitioner attempted to commit suicide by overdosing with Elavil and was admitted to Erlanger Hospital in Chattanooga. The trial court declared a mistrial of the penalty phase. On February 13, 1987, a different jury imposed a sentence of death by electrocution.

B.    **Subsequent Proceedings**

On direct appeal, the petitioner raised the following issues:

1.    Whether he was denied the right to a speedy trial.
2.    Whether he was denied the right, pursuant to Tenn. Code. Ann. § 40-18-103, to be tried within one hundred and fifty (150) days of his arraignment.
3.    Whether the trial court erroneously admitted into evidence numerous photographs, which were unfairly prejudicial.
4.    Whether the trial court erroneously admitted into evidence unsigned copies of the petitioner's prior convictions.
5.    Whether the trial court improperly admitted evidence that the petitioner was prepared to commit another contractual murder.
6.    Whether the trial court erroneously instructed the jury concerning the offense of accessory before the fact.
7.    Whether, with respect to the penalty phase of the petitioner's trial, the trial court erroneously quashed subpoenas duces tecum issued to the Commissioner of Corrections and the warden of the state penitentiary.
8.    Whether Tenn. Code. Ann. § 39-2-203, setting forth the sentencing procedure for first degree murder, was unconstitutional.

Wilcoxson, 772 S.W.2d at 33. As noted earlier, the supreme court affirmed the

8

petitioner's conviction and sentence, Id. at 40; however, in post-conviction proceedings, the post-conviction court affirmed the petitioner's conviction but reversed his sentence of death, concluding that the petitioner had received ineffective assistance of counsel during the penalty phase of his trial. Again, the State concedes that the petitioner is entitled to a new sentencing hearing. Accordingly, the issues currently before this court relate solely to the post-conviction court's affirmance of the petitioner's conviction.

**C.      Post-Conviction Evidentiary Hearing**

The post-conviction court conducted an evidentiary hearing on April 7 and 8, 1997. One of the principal issues at the hearing was whether the petitioner's trial counsel were ineffective in failing to investigate and present evidence concerning the petitioner's mental condition both at the time of the offense and at the time of trial. Petitioner's counsel introduced numerous exhibits, including the petitioner's records from the federal penitentiary system from 1958 through 1982, his records from Fortwood Psychiatric Center in Chattanooga from 1982 through 1987, his records from the Tennessee Department of Correction from 1987 through 1996, and his records from DeBerry Special Needs Facility in Nashville from November 1996 through February 1997.

The federal penitentiary records reflect that, during his incarceration, the petitioner was diagnosed on different occasions with "a chronic case of anxiety," "psychoneurosis anxiety reaction, chronic, severe," "passive, aggressive personality disorder," "antisocial personality," "borderline psychiatric condition," and schizophrenia. The petitioner was prescribed antipsychotic drugs, including Stelazine, Thorazine, Mellaril, and Prolixin.

9

The Fortwood records indicate that the petitioner was taking Stelazine at the time of the murder in 1982 through May 14, 1986, approximately five months after his arrest for the Mosher murder and five months prior to his trial. Additionally, the records reflect that the petitioner was diagnosed with "Bipolar Disorder, Mixed" on October 15, 1984.

The records from the Tennessee Department of Correction, reflect that, between 1987 and 1996, the petitioner was diagnosed on various occasions with paranoid schizophrenia, bipolar disorder, and a personality disorder with antisocial and narcissistic traits. Additionally, the records indicate that, during his incarceration, the petitioner began refusing medications, resulting in the significant deterioration of his mental condition. The petitioner was finally admitted to the DeBerry Special Needs Facility on November 21, 1996. The records from DeBerry establish that Dr. Jan Mayer diagnosed the petitioner with either a schizo-affective disorder, manic, or a bipolar disorder. The records further reveal that, upon medication with Prolixin, followed by Stelazine and Lithium, the petitioner's condition improved dramatically.

Petitioner's counsel also presented the testimony of Gillian Blair, a licensed clinical psychologist appointed by the post-conviction court pursuant to the petitioner's ex parte motion. Dr. Blair met with the petitioner on two occasions, on August 26, 1996, and on October 28, 1996, at the Riverbend Maximum Security Institution. On the first visit, Dr. Blair met with the petitioner for less than one hour. The petitioner was initially "very affable and very friendly." However, he was unable to sit still and demonstrated "pressured speech." Dr. Blair explained:

> [H]e spoke very rapidly, so rapidly that the words almost
> sort of like run into each other. He demonstrated like
> flight of ideas, he would flit from one idea to another. His
> speech has a very sort of grandiose flair to it. . . . [B]y the

10

same token, he seemed very intelligent. He demonstrated good vocabulary. He was clearly oriented but he was very labile, meaning that he would switch from being very affable to being extremely angry with, from my perception, very little provocation.

When the petitioner read the court's order authorizing a psychological assessment, he became "very, very agitated" and, ultimately, terminated the interview, refusing to sign a form reflecting his permission for the assessment and refusing to sign forms authorizing the release of information relating to his case. Dr. Blair recalled, "He was at times very verbally threatening. He was verbally abusive in that he called me a lot of derogatory names."

Dr. Blair's second meeting with the petitioner was shorter than her first meeting. Again, the petitioner was initially "very affable and very friendly." However, the petitioner refused to sign any forms and soon became agitated and threatening, terminating the interview.

Due to the petitioner's refusal to cooperate, Dr. Blair was unable to assess his current competence with any certainty, although she tentatively opined that the petitioner was not competent during the post-conviction proceedings. Additionally, on the basis of the petitioner's mental health records and on the basis of her brief interviews with the petitioner, Dr. Blair concluded that the petitioner was probably suffering from a schizo-affective disorder. Dr. Blair defined a schizo-affective disorder:

> Schizo-affective disorder has some of the symptoms that we typically see in schizophrenia and along with either major depression, manic episode or mixed episode, mixed being mixed mania and depression. But you also as well as having the affective component of the mania or depression, you have symptoms consistent with schizophrenia, where you would either see delusions, hallucinations, disorganized speech, frequent derailment of their speech, incoherence in their speech, grossly disorganized or catatonic behavior.

11

Dr. Blair noted that the petitioner also exhibited "grandiosity," a symptom more commonly associated with a bipolar disorder. However, she testified that grandiosity can also result from other psychoses. Dr. Blair explained that grandiosity occurs when "someone has like an elevated opinion of themselves or believes that they can do things that maybe other people would think that they can't or that they would expect special treatment . . . ." She asserted that the petitioner's periodic denials of any mental illness and his manipulative behavior were consistent with her diagnosis of a schizo-affective disorder.

Dr. Blair also observed that "it's . . . clear from the records that Mr. Wilcoxson . . . has periods when the [psychotic] symptoms are in remission." Dr. Blair further conceded that the petitioner's mental health records reflect that he is capable of planning and generally capable of understanding the consequences of his actions. She explained:

> Some people who are schizophrenic, psychotic, would not be able to understand the consequences of their behavior and others would. I think any mental illness there is a continuum of dysfunction, so someone who is mentally ill, whether it be with schizophrenia or bipolar disorder or schizo-affective could understand the consequences of their behavior while another individual may not and have the same diagnosis.

Finally, Dr. Blair agreed that antipsychotic medication can render a mentally ill individual competent, and that the petitioner's mental health records reflect that the petitioner was taking medication at the time of the Mosher murder.

The petitioner next called Dr. Jan Mayer, a psychiatrist who treats inmates at the Lois DeBerry Special Needs Facility in Nashville. He testified that he treated the petitioner for several months at DeBerry in late 1996 and early 1997. On November 21, 1996, he diagnosed the petitioner with either a schizo-affective disorder, manic type, or a bipolar mood disorder. He opined at the post-conviction

12

evidentiary hearing that the petitioner was more likely suffering from a bipolar mood disorder. He explained that a person with a schizo-affective disorder can experience psychotic symptoms, such as delusional ideas or beliefs and hallucinations, without mood disturbance. In contrast, a person with bipolar mood disorder always experiences psychotic symptoms in conjunction with a mood disturbance. In any case, he concluded that the petitioner was suffering from "a chronic, long term, serious mental disorder."

Dr. Mayer also testified that, during the course of his treatment of the petitioner, the petitioner exhibited symptoms including hyperactivity, agitation, and thought disorganization. The petitioner also denied that he was mentally ill. Dr. Mayer agreed with Dr. Blair that the petitioner's periodic denial of his mental disorder is itself a symptom of his disorder. Indeed, Dr. Mayer testified that the petitioner often minimizes symptoms of his disorder, although he does not possess "the capacity to fake anything" "when he is at a peak of a manic episode." Dr. Mayer also agreed with Dr. Blair that the petitioner's manipulative behavior is consistent with a diagnosis of mental illness.

Dr. Mayer observed that Stelazine is only administered to individuals suffering from "major psychotic disorder[s]." He stated that he would expect anyone treated with Stelazine to be evaluated prior to trial for a determination of competency and the feasibility of asserting an insanity defense or a claim of diminished capacity.

Finally, Dr. Mayer conceded:

If someone is psychotic and they are not competent because of that and they are treated and their disorder is in remission, then they can become competent at that particular time . . . .

13

Thus, Dr. Mayer observed that, although the petitioner was legally incompetent when he was admitted to DeBerry on November 21, 1996, he may have been competent when he was discharged on January 14, 1997, following treatment with antipsychotic medications. Dr. Mayer further explained that the petitioner's mental disorder is episodic or cyclical. Dr. Mayer opined that the petitioner's mental illness "is fairly variable based on the course of his illness and whether he is taking his medications" and one could not "rely on observations and judgments of [the petitioner] in any sustained consistent sense."

In rebuttal, the State called Dr. Sam Craddock, a psychologist with the Forensic Services Division of the Middle Tennessee Mental Health Institute. On July 20, 1994, pursuant to the order of the post-conviction court, Dr. Craddock evaluated the petitioner's competency to withdraw his petition for post-conviction relief. He was accompanied by Dr. Rokeya Farooque, a psychiatrist, and Rebecca Smith, a social worker, and met with the petitioner for approximately one and one half hours. Dr. Craddock testified that the team discussed with the petitioner the possible consequences of withdrawing his petition for post-conviction relief and "he gave us the impression he had a full understanding of what might happen." Additionally, he opined that the petitioner appeared to understand the proceedings during the post-conviction evidentiary hearing and that the petitioner was capable of assisting counsel but chose not to cooperate.

Dr. Craddock admitted that, at the time of the team's evaluation of the petitioner, the examiners did not have access to the petitioner's mental health records. Moreover, during the initial interview, the petitioner exhibited grandiosity, "a tendency to talk in a tangential fashion," pressured speech, a low threshold of irritation, and intolerance of deficiencies in others. Dr. Craddock opined at the post-

conviction evidentiary hearing that these symptoms could reflect a mental disorder but did not preclude a finding of competence. In fact, the team concluded following the initial interview that the petitioner was competent:

> It is the opinion of the Forensic Services Evaluation Team that Mr. Wilcoxson's basis for his decision is not the result of illogic, a deranged mind, or an inability to think rationally. The Forensic Service examiners did not see signs of a mental illness nor did Mr. Wilcoxson report systems suggestive of mental impairment that would preclude his capacity to make a reasoned decision and right to self-determination.

Several days following the evaluation, Dr. Craddock received from the District Attorney General's office the supplemental brief filed by petitioner's counsel in support of a "Motion for Funds for Expert Assistance from a Psychiatrist and/or Psychologist." The brief summarized the petitioner's mental health history and included excerpts from the petitioner's mental health records. Dr. Craddock reviewed this additional information prior to interviewing the petitioner a second time. The purpose of the second interview was to administer the Wechsler Adult Intelligence Scale Revised. Due to the petitioner's refusal to cooperate, Dr. Craddock was only able to administer that portion of the test which measures reasoning and judgment. The petitioner achieved the lowest possible score on questions concerning abstract reasoning.

At the post-conviction evidentiary hearing, Dr. Craddock conceded that the records before the court appeared to reflect "a chronic, long-term mental disorder." Moreover, Dr. Craddock agreed that, while the petitioner was competent at the time of the forensic team's evaluation, the petitioner might not be competent at other times. Finally, Dr. Craddock testified that a majority of individuals possessing a psychiatric history comparable to the petitioner's would be referred to the Middle Tennessee Mental Health Institute for pre-trial evaluation.

15

Petitioner's counsel also presented the testimony of James Anderson, a correctional officer at the Riverbend Maximum Security Institution. Officer Anderson testified that he had worked in the unit in which the petitioner was incarcerated since January 1992. Officer Anderson testified that, in the past, the officers had been frequently forced to segregate the petitioner from other inmates due to his behavior, which included "constant harassment of other inmates, the noise, throwing of [feces] and urine and stuff out the pie flaps, stinking up the unit, pod, and just, you know, general constant harassment." He stated that the petitioner's behavior "was very much a daily affair."

However, Officer Anderson also noted that the petitioner's behavior was sometimes a response to provocation by other inmates. Additionally, the officer observed that the petitioner would briefly control his behavior when the officer would give the petitioner coffee or a cigarette. Officer Anderson concluded, "Bobby has -- since he has been under medication, he has been 100% better in my opinion."

Donna Maria Phillips, a correctional officer with the Riverbend Maximum Security Institution, testified that the petitioner was first incarcerated in her unit in 1990. The petitioner "act[ed] out" almost every day by throwing urine and feces at officers, yelling at the officers, igniting fires in his cell, and provoking other inmates. The officers were required to use "4-point restraints" approximately three times each week.

Officer Phillips conceded that, in prison, inmates commonly throw food or feces or urine at correctional officers and attempt to start fires in their cells. However, she asserted that the petitioner engaged in this type of activity far more frequently that the average inmate. She also stated that the petitioner was capable

16

at times of interacting normally with other inmates and with officers and appeared to be capable of controlling his behavior, whether normal or aberrant.

Both Hiram Hill and Bates Bryan, the petitioner's trial attorneys, also testified at the post-conviction evidentiary hearing. Mr. Bryan testified that he has been practicing law since, approximately, 1977. The trial court appointed him to represent the petitioner in January 1986. Mr. Bryan requested Mr. Hill's appointment as co-counsel due to Mr. Hill's experience with capital litigation and, generally, his experience in representing defendants in criminal cases. Mr. Hill testified that he had been practicing law since 1978 and had represented numerous defendants in criminal cases prior to his appointment in the petitioner's case. Moreover, he had previously participated in one capital case and had attended a seminar on death penalty representation, acquiring a manual on capital litigation.

Mr. Hill testified that he spent "hundreds" of hours on the factual investigation of the petitioner's case. According to Mr. Hill, both he and Mr. Bryan spoke with "every factual witness that there was there because that's the only thing we had to go on." Mr. Hill observed:

> It was a very difficult factual case to . . . deal with because he had been so extensive in his discussion of this homicide on undercover tapes. We spent literally hours and hours and hours getting those tapes redacted to leave out issues as to other crimes . . . .

Mr. Bryan also testified that he spent approximately seven hundred and fifty (750) hours to one thousand (1,000) hours preparing for the petitioner's trial. He stated:

> [W]e spent . . . a number of nights till 1 and 2 o'clock in the morning going through things. It was just a continual process. Both Mr. Hill and myself let a lot of other practice slide completely just to handle this case.

The petitioner's attorneys testified that, prior to trial, they obtained a

17

complete personal history from the petitioner and reviewed his records from the federal penitentiary system and from the Fortwood Psychiatric Center in Chattanooga. Additionally, they testified that the petitioner fully participated in his defense and appeared competent prior to and during his trial. Moreover, Mr. Hill testified that the petitioner was "adamant that he would not allow any evaluation of him. That he would not allow us to present any sort of insanity defense or anything like that." Accordingly, neither Mr. Hill nor Mr. Bryan requested a psychological or psychiatric examination of the petitioner or requested funds for an investigator to assist in compiling additional information about the petitioner's mental health history. Mr. Bryan also testified that he agreed with the petitioner that insanity was not a feasible defense.

William Redick, an attorney specializing in death penalty litigation, testified on behalf of the petitioner. Initially, Mr. Redick testified concerning his personal observations of the petitioner. Mr. Redick stated that he became involved in the petitioner's case when the petitioner contacted him prior to submitting a petition for certiorari to the United States Supreme Court on direct appeal. Mr. Redick met with the petitioner on three to five occasions, each visit exceeding one hour. The petitioner communicated to Mr. Redick that he was dissatisfied with his legal representation and intended to proceed pro se. Upon learning that the petitioner's attorneys were in fact withdrawing from the petitioner's case, Mr. Redick attempted to assist the petitioner in drafting his petition to the Supreme Court. Mr. Redick testified, "He would run ideas by me and he would make observations and we just communicated about strategy and things like that if that's what you want to call it." However, Mr. Redick also stated that the petitioner's draft of his petition was "incomprehensible," and that the petitioner refused to follow his advice. Mr. Redick noted that the petitioner "was a guy who thought he knew what he was talking about

18

all the time." Additionally, the petitioner would claim that he knew people, such as judges and law school deans. Mr. Redick observed that "these relationships, these contacts that he was talking about didn't seem to me to be based in reality." Mr. Redick conceded that the petitioner is intelligent and possesses a good vocabulary.

William Redick additionally testified as an expert in death penalty litigation. He testified that he had represented criminal defendants facing the death penalty since the late 1970's. Mr. Redick stated that he had been counsel of record in at least twenty capital cases at some stage in the proceedings and had provided consultations in approximately one hundred or two hundred capital cases. From 1985 until 1993 or 1994, Mr. Redick was the Chairman of the Death Penalty Committee of the Tennessee Association of Criminal Defense Lawyers. From 1988 until 1995, he also served as the director of the Tennessee Capital Case Resource Center. In 1985, he edited the first Tennessee Death Penalty Defense Manual, published by the Tennessee Association of Criminal Defense Lawyers. He also edited succeeding editions.

Mr. Redick conceded that the Capital Case Resource Center through the American Bar Association had recruited Mr. James E. Brenner, the petitioner's post-conviction counsel, to represent the petitioner in the post-conviction proceedings. Mr. Redick also testified that he was assisting Mr. Brenner in representing the petitioner in these post-conviction proceedings. Indeed, Mr. Redick stated that, prior to the post-conviction hearing, he had discussed with Dr. Mayer the content of his proposed testimony. The record of the post-conviction evidentiary hearing reflects that, during the hearing, Mr. Redick was consulting with Mr. Brenner.

Additionally, Mr. Redick testified that he may very well have been consulted by the petitioner's trial attorneys prior to the petitioner's trial. If consulted, he would have provided the petitioner's attorneys with a copy of the Tennessee Death Penalty Defense Manual and other publications. He would also have discussed strategy with the petitioner's attorneys.

With respect to the performance of the petitioner's trial counsel, Mr. Redick testified that he had reviewed the transcript of the petitioner's trial proceedings and concluded that the petitioner had received ineffective assistance of counsel due to counsel's failure to investigate the petitioner's competence and the feasibility of asserting either a defense of insanity or a claim of diminished capacity. Mr. Redick referred to the American Bar Association's Standards for Criminal Justice and stated that an attorney in a criminal trial has a duty to investigate, which is independent of his or her client's wishes. Mr. Redick further opined that petitioner's counsel should have requested funds for expert and investigative assistance in determining the petitioner's mental state at the time of the offense and at trial and in collecting information concerning the petitioner's past treatment for mental illness.

Mr. Redick conceded that, during the post-conviction evidentiary hearing, he had heard no proof that the petitioner was insane or possessed diminished capacity at the time of the offense in this case. He also conceded that he did not know what effect additional investigative efforts would have had upon the result of the petitioner's trial. Nevertheless, he opined that counsel's failure to engage in further investigation "cast doubt" upon the outcome of the petitioner's trial.

## II. Analysis

20

## A.    Ineffective Assistance of Counsel

The petitioner challenges his attorneys' performance during the guilt/innocence phase of his trial and on direct appeal. We initially note that the petitioner bears the burden in post-conviction proceedings of proving the allegations in his petition by a preponderance of the evidence. Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Additionally, the findings of fact of the post-conviction court are afforded the weight of a jury verdict and are conclusive on appeal unless the evidence in the record preponderates against those findings. Henley v. State, 960 S.W.2d 572, 578-579 (Tenn. 1997), cert. denied, __ U.S. __, 119 S.Ct. 82 (1998); Bates v. State, 973 S.W.2d 615, 631 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1997), cert. denied, __ U.S. __, 118 S.Ct. 2067 (1998).

The post-conviction court in this case concluded that the petitioner's counsel provided constitutionally effective representation during the guilt/innocence phase. Accordingly, this court must determine whether the evidence preponderates against the post-conviction court's findings (1) that counsel's performance was within the range of competence demanded of attorneys in criminal cases, Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), and (2) that any deficient performance did not prejudice the petitioner. Strickland v. Washington, 466 U.S. 668, 687-697, 104 S.Ct. 2052, 2064-2069 (1984). See also Henley, 960 S.W.2d at 579-580; Powers v. State, 942 S.W.2d 551, 557 (Tenn. Code. Ann. 1996). Courts need not address these components in any particular order or even address both if the petitioner fails to meet his burden with respect to one. Henley, 960 S.W.2d at 580.

In evaluating counsel's performance, this court should not examine every allegedly deficient act or omission in isolation, but rather in the context of the case as a whole. State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988).

21

The primary concern of the court should be the fundamental fairness of the proceeding whose result is being challenged. Id. (citation omitted). Therefore, this court should not second-guess tactical and strategic decisions by defense counsel. Henley, 960 S.W.2d at 579. Instead, this court must reconstruct the circumstances of counsel's challenged conduct and evaluate the conduct from counsel's perspective at the time. Id. See also Irick v. State, 973 S.W.2d 643, 652 (Tenn. Crim. App.), perm. to appeal denied, (Tenn.), cert. denied, __ U.S. __, 119 S.Ct. 219 (1998).

However, this court's deference to counsel's tactical decisions will depend upon counsel's adequate investigation of his options. Burger v. Kemp, 483 U.S. 776, 794, 107 S.Ct. 3114, 3126 (1987). That having been said, one court has observed:

> Judges wisely defer to *true* tactical choices - that is to say, to choices between alternatives that each have the potential for both benefit and loss. We are in a poor position to judge, on the cold record, the quality of such a choice, made as it is in the fine-grained texture and nuance of the particular proceeding.

Profitt v. Waldron, 831 F.2d 1245, 1249 (5th Cir. 1987)(emphasis added). Accordingly, assuming adequate investigation, the fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1997); Dickerson v. State, No. 03C01-9710-CR-00472, 1998 WL 619110, at *1 (Tenn. Crim. App. at Knoxville, September 16, 1998), perm. to appeal denied, (Tenn. 1999).

In sum, a defendant is not entitled to perfect representation, only constitutionally adequate representation. Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective

22

assistance of counsel, '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.'" Burger, 483 U.S. at 794, 107 S.Ct. at 3126. Thus, we have observed:

> In order to pass constitutional muster, counsel need not discover every possible item of information before trial, make every possible objection during trial, or use every trial tactic which petitioner would in retrospect, now require ... .

Allen v. State, No. 960, 1991 WL 154520, at *2 (Tenn. Crim. App. at Knoxville, August 14, 1991). Nevertheless, "we recognize that 'our duty to search for constitutional [deficiencies] with painstaking care is never more exacting than it is in a capital case.'" Smith v. State, No. 02C01-9801-CR-00018, 1998 WL 899362, at *11 (Tenn. Crim. App. at Jackson, December 28, 1998), perm. to appeal granted, (Tenn. 1999)(citing Burger, 483 U.S. at 785, 107 S.Ct. at 3121).

Yet, even if the petitioner establishes that counsel's performance was not within the requisite range of competence, his task is not complete. He must also demonstrate a reasonable probability that the result of the proceeding would have been different but for the defective performance of counsel. Henley, 960 S.W.2d at 580. To satisfy his burden, the petitioner need not demonstrate that the trial would otherwise have resulted in an acquittal, if he can demonstrate a reasonable probability that a jury would have found him guilty of a lesser offense. Smith, No. 02C01-9801-CR-00018, 1998 WL 899362, at *12.

The prejudice prong of the Strickland test "continues to be the primary hurdle to be cleared in Sixth Amendment assistance of counsel cases," but "[t]his obstacle . . . is not insurmountable." Profitt, 831 F.2d at 1251.

> "A court must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.

23

> Some errors will have had a pervasive effect on the
> inferences to be drawn from the evidence, altering the
> entire evidentiary picture, and some will have had an
> isolated, trivial effect ... ."

Henley, 960 S.W.2d at 580 (citations omitted). With these general principles in

mind, we address the petitioner's specific allegations of ineffective assistance of

counsel.

### i. The Petitioner's Competency to Stand Trial

The petitioner first alleges that his attorneys were ineffective for failing

to raise the issue of his competency to stand trial by requesting a psychological or

psychiatric examination prior to trial. It has long been held that subjecting a mentally

incompetent defendant to trial violates his right to due process of law. Drope v.

Missouri, 420 U.S. 162, 171, 95 S.Ct. 896, 903 (1975). In Dusky v. United States,

362 U.S. 402, 402, 80 S.Ct. 788, 789 (1960), the United States Supreme Court set

forth the test applicable under the federal constitution in evaluating a defendant's

mental competency to stand trial:

> [W]hether he has sufficient present ability to consult with
> his lawyer with a reasonable degree of rational
> understanding - and whether he has a rational as well as
> factual understanding of the proceedings against him.

In other words, a defendant must possess the capacity to understand the nature and

object of the proceedings against him, to consult with counsel, and to assist in

preparing his defense. Drope, 420 U.S. at 171, 95 S.Ct. at 903. Tennessee courts

have adopted this standard. See State v. Black, 815 S.W.2d 166, 173-174 (Tenn.

1991); Mackey v. State, 537 S.W.2d 704, 707 (Tenn. Crim. App. 1975); State v.

Leming, No. 01C01-9704-CC-00151, 1998 WL 707801, at *6 (Tenn. Crim. App. at

Nashville, October 9, 1998).

However, "[n]ot all people who have a mental problem are rendered by

24

it mentally incompetent." Bouchillon v. Collins, 907 F.2d 589, 593 (5th Cir. 1990). See also, e.g., Galowski v. Berge, 78 F.3d 1176, 1182 (7th Cir. 1996)(citation omitted)("'[n]ot every manifestation of mental illness demonstrates incompetence to stand trial'"); United States v. Hogan, 986 F.2d 1364, 1373 (11th Cir. 1993)(mental illness is not, in itself, enough to establish incompetence); People v. Edmonds, 578 N.E.2d 952, 960 (Ill. 1991)("[a] defendant may be competent to participate at trial even though his mind is otherwise unsound"). Conversely, courts have acknowledged that, even if a criminal defendant has an intellectual understanding of the charges against him, he may be incompetent if his impaired sense of reality substantially undermines his judgment and prevents him from cooperating rationally with his lawyer. United States v. Hemsi, 901 F.2d 293, 296 (2nd Cir. 1990); Lafferty v. Cook, 949 F.2d 1546, 1551 (10th Cir. 1991). In other words, sufficient contact with reality is the touchstone for ascertaining the existence of a rational understanding of the proceedings. Lafferty, 949 F.2d at 1551.

One observer has proffered the following rationale for the requirement that a criminal defendant be competent to stand trial:

> In this country we hold autonomy of the individual as one of our highest values. This respect for personal autonomy supplies the foundation for the power the accused has to defend him or herself. After all, it is the life or freedom of the accused that hangs in the balance. It follows, therefore, that the accused should be granted authority in the process determining the outcome. If the mental state of the accused prevents a rational understanding of the proceeding, the foundation for the accused's power to control the defense is lacking. An incompetent is no longer "in control" of his decision-making process and is therefore incapable of making the decisions required by the process that may result in a finding of blame and an imposition of punishment.

Norma Schrock, Defense Counsel's Role in Determining Competency to Stand Trial, 9 Geo. J. Legal Ethics 639, 654 (Winter, 1996). In sum, the competence of a criminal defendant is critically important, because a defendant has exclusive

authority to make the ultimate decisions about his case, once having been fully informed of the rights and the potential consequences involved. Zagorski v. State, 983 S.W.2d 654, 658-661 (Tenn. 1998)(affirming a competent defendant's right to decline to present mitigating evidence during the sentencing phase of his capital trial). See also Sup. Ct. Rule 8, EC 7-7.

Consistent with this rationale, the American Bar Association's Standards for Criminal Justice provide that defense counsel should move for evaluation of a defendant's competence to stand trial whenever he has a good faith doubt as to the defendant's competence, even if the client objects to such a motion being made. ABA Standards for Criminal Justice § 7-4.2(c) (1986). Similarly, the United States Court of Appeals for the Third Circuit has stated:

> In short, we think it axiomatic that the desire of a defendant whose mental faculties are in doubt to be found competent does not absolve counsel of his or her independent professional responsibility to put the government to its proof at a competency hearing when the case for competency is in serious question.

Hull v. Freeman, 932 F.2d 159, 168 (3rd Cir. 1991), overruled on other grounds by Coleman v. Thompson, 501 U.S. 722, 111 S.Ct. 2546 (1991). In accordance, several courts have held that a corollary of the requirement that a defendant in a criminal trial be competent is the duty of his attorney to raise the issue of competency whenever he has reasonable cause to believe that a defendant may be incompetent. See, e.g., Galowski, 78 F.3d at 1180; Loe v. United States, 545 F. Supp. 662, 666 (E.D. Va. 1982); State v. Johnson, 551 N.W.2d 742, 784 (Neb. Ct. App. 1996); People v. Kinder, 512 N.Y.S.2d 597, 600 (N.Y. App. Div. 1987); State v. Johnson, 395 N.W.2d 176, 182 (Wis. 1986).[5]

---

[5]We note that, at the time of the petitioner's trial, Tenn. Code. Ann. § 33-7-301 (1986) provided that a court may order an evaluation of a defendant whenever the defendant is believed to be incompetent to stand trial or there is a question as to his mental capacity at the time of the commission of the crime. Moreover, in Pate v. Robinson, 383 U.S. 375, 385-386, 86 S.Ct. 836, 842 (1966), the United States Supreme Court held that, consistent with principles of due process, a trial

26

Thus, in evaluating the petitioner's claim of ineffective assistance of counsel, we must determine whether petitioner's counsel had reasonable cause to raise the issue of his competency. We initially note that this is *not* a case in which counsel failed to conduct any investigation of the petitioner's history of mental illness. Rather, counsel reviewed records pertaining to the petitioner's past psychological and psychiatric treatment in the federal penitentiary system and at Fortwood Psychiatric Center. Moreover, the petitioner has not indicated what other records, if any, counsel should have obtained and reviewed prior to trial.[6] In any case, the petitioner does assert that, on the basis of the federal penitentiary records, the Fortwood records, and other information received by counsel, they should have requested a psychological or psychiatric evaluation of the petitioner to determine his competency. Therefore, in order to evaluate counsel's performance, it is essential to delineate the information received by counsel prior to and during the petitioner's trial.

The records of the petitioner's incarceration in the federal penitentiary system, submitted by the petitioner during the post-conviction evidentiary hearing, indicate that the petitioner was incarcerated in the United States Penitentiary in Atlanta, Georgia on March 3, 1964.[7] The petitioner had been sentenced to life imprisonment pursuant to his conviction of murdering a security guard during a bank

_____

court might be required to conduct a competency hearing upon his receipt of evidence concerning a defendant's irrational behavior or any prior medical opinion on the defendant's competence or upon observing the defendant's demeanor at trial. See also Drope, 420 U.S. at 180, 95 S.Ct. at 908.

[6]At the post-conviction evidentiary hearing, petitioner's counsel asserted that he required additional funds and additional time in order to investigate further the petitioner's history of mental illness. The trial court determined that the record was sufficient to resolve the petitioner's claims. The petitioner does not challenge this determination on appeal.

[7]Because trial counsel failed to preserve copies of the records in their case files, it is not entirely clear whether they reviewed all of the records submitted at the post-conviction evidentiary hearing. Nevertheless, Mr. Bryan testified that he reviewed the Fortwood records and that he probably reviewed all of the federal penitentiary records as well. Mr. Hill could not recall precisely what records they reviewed. Nevertheless, he testified that he was aware of the petitioner's psychiatric or psychological treatment at these institutions.

robbery in Brooklyn, New York. Upon his incarceration in the federal penitentiary, the petitioner stated in a "Neuropsychiatric Questionnaire" that he had previously been treated by a psychologist or psychiatrist and desired psychiatric treatment. He recounted that he had suffered serious head injuries during an automobile accident in 1949 and had previously experienced a "severe mental shock." He asserted that he experienced headaches, was very nervous, and suffered from bad dreams. He also admitted drug and alcohol abuse.

On March 20, 1964, the United States Department of Justice, Bureau of Prisons, completed a "Classification Study" of the petitioner. The study indicated that the petitioner had not completed high school and possessed "slightly below average intellect." The study further noted:

> This subject is the product of a very unfavorable early environment and he has been diseased emotionally and socially all of his life. . . .

> In the interview, this subject was a very verbose, loquacious individual who describes [his] killing of [a] bank guard in a very cold-blooded, calculated tone of voice and seems to gloat over the fact that he shot first. . . . He enjoys being interviewed and he told at great lengths the number of times he had been interviewed by psychiatrists on this case and how he out talked them. He claims that he is a whole lot smarter than he had ever realized until he became involved in this trouble. He states he likes to read, especially the dictionary, and has been studying the dictionary for a year and one-half to improve his vocabulary. . . . It is noted that he used several big words that did not fit in with what he was talking about and he evidently did not know the full meaning of the words.

> Wilcoxson is an anti-social individual who has been in a great deal of trouble and who has been unable to conform to the prevailing culture of his time. . . . He is an amoral, callous, emotionally immature individual who handles the truth very recklessly and rationalizes his behavior so that it appears warranted, reasonable and justified, at least to him. He is rather flamboyant and unpredictable and needs to be under the strictest control for many years to come. He is easily frustrated and his history indicates that he has a violent and uncontrollable

28

temper.  He likes to talk about his case and about his past experiences and he has an excellent memory, or, we might say, he has a vivid imagination. . . . He is a badly warped individual  . . .  He resents authority in any form . . . He is a shrewd, cunning, dangerous, individual who should never be turned loose upon society.

In significant contrast to this evaluation, another officer reported in the same study:

This slender, young man is careless about his appearance.  He is quiet, polite and has a good attitude.  He is not aggressive and has limited association with inmates.  He cooperates willingly, has a friendly personality and reacts obediently to instructions and is a fairly good worker.

As noted earlier, the federal penitentiary system records reflect that the petitioner was subsequently diagnosed with various mental conditions, including schizophrenia and was prescribed antipsychotic medications.  Moreover, on April 23, 1979, the petitioner was admitted to the prison hospital when he began to hallucinate.  The attending physician noted:

According to the cell house officer this patient was walking around in a semi-stupor state, attempting to make a long distance call to Dr. Diggs. . . . Patient . . . was oriented to person, place and time, however express[ed] . . . hallucinations such as participation in events out side of the institution walls today.  There also appeared to be some depressive components to hallucinations. . . . On examination, this patient appears to oriented to time and place and has a full grasp of reality.  He stated that he does things when he feels that he can not get what he wants.  On the third day the patient became anxious and very restless.  Patient has limited attention span with flightiness of ideas and general loose associations.  Patient was oriented though with a elevated affect and is mildly hallucinating with some paranoid ideation.  So he remained in a lock ward status. . . . The psychology dept. found out on 3/30/79 that this patient was experiencing hallucinations and he was delusional and emotional labile agitated at times and inadequate control with reality.  Cell was destroyed with items in which he periodically throws out the tray slot. My evaluation of this patient is that he is a manipulator.  He is well oriented and knows whats going on and has no loss of reality.  (no loss of contact with reality) He vigorously protested when not allowed to attend a seminar . . . Behavior was inappropriate but goal directed

29

and made with a substantial appreciation of right and wrong behavior.

The petitioner was again admitted to the prison hospital on September 17, 1979.

The attending physician noted:

> The patient was admitted . . . from Segregation in poor contact with reality with elevated affect and motor behavior, delusional thinking with characteristic delusions of grandeur, flightiness of thought and difficulty in following verbalizations. He is known to have schizophrenia, paranoid type, and was mildly agitated at the time of admission. He has been on long term medication for his schizophrenia but does not take his medicines sometimes.
>
> * * *
>
> Patient was treated for decompensation of his schizophrenia using Thorazine and Cogentin. On this treatment and over a period of four or five days, he gradually improved, became more calm and relaxed, in good contact with reality, although he continued to demonstrate some elevation of affect and motor activity and his thought content was not always logical. By 10/3/79, he had stabilized well and was discharged . . . .

On July 11, 1980, the petitioner was transferred to the United States Penitentiary in Leavenworth, Kansas. At that time, the petitioner was taking Stelazine, an antipsychotic medication, and an examining physician noted that his schizophrenia was in remission. The petitioner remained at the Leavenworth penitentiary until he was released on parole in 1982.

Upon his release, the petitioner began receiving treatment at the Fortwood Psychiatric Center in Chattanooga, Tennessee. He continued receiving treatment at Fortwood until May 14, 1986, approximately five months after his arrest for the instant offense and five months prior to his trial.

The Fortwood records reflect that, on March 17, 1982, the petitioner's

30

counselor noted "a definite pattern of affective illness, especially when [the petitioner] stopped Stelazine." Accordingly, the petitioner was prescribed Stelazine and, apparently, for the most part, continued to take the antipsychotic medication during the entire course of his treatment at Fortwood.

While receiving treatment at Fortwood, the petitioner was periodically employed and, in July 1982, married another patient at Fortwood. In 1982, the petitioner did not report psychotic symptoms to his counselor. However, on two occasions, the counselor noted that his speech was "pressured," and the counselor noted on June 22, 1982, that the petitioner, "while not psychotic," exhibited paranoid ideation quite frequently. The petitioner did not report any psychotic symptoms in 1983 and, in February 1984, reported that, although he occasionally experienced hyperactivity, he had not experienced psychotic symptoms "in a good while."

However, on October 15, 1984, the petitioner reported to a psychiatrist that he was experiencing depression due to his wife's declining health, his recent unemployment, and accompanying financial difficulties. He stated that his sleep was disturbed, his energy level was decreasing, and he was experiencing mood swings, including suicidal ideation. The psychiatrist diagnosed the petitioner with "Bipolar Disorder, Mixed."

On March 18, 1985, the petitioner reported that his wife had died of an overdose. The record indicates that for several months thereafter the petitioner again began abusing alcohol, but sought additional counseling and was able to control the problem. The record also reflects that, following his wife's death, the petitioner stopped taking Stelazine for approximately four months. During this time, the petitioner experienced periods of hyperactivity and he experienced difficulty

31

sleeping.

On September 4, 1985, the petitioner also revealed to his psychiatrist that he was experiencing feelings of paranoia about certain people. The petitioner asserted, however, that he was "rational enough not to let this bother him." The psychiatrist again prescribed Stelazine. However, during the ensuing month, the petitioner continued to exhibit hyperactivity, including rapid speech, and was "[r]ather grandiose at times" concerning his accomplishments and acquaintances. Additionally, the petitioner continued to experience feelings of paranoia, although the petitioner again asserted that "he knows better."

On December 13, 1985, the petitioner reported that he had attempted to commit suicide by overdosing with prescription drugs. However, the counselor subsequently concluded that the "suicidal gesture (if true) was an attention getting gesture."

The petitioner was arrested on December 19, 1985, for the instant offense. As noted previously, the petitioner continued receiving treatment from the Fortwood Psychiatric Center for several months. On February 18, 1986, the petitioner reported to his psychiatrist that he had not been taking his medications while in jail. He stated that he was nervous, paranoid, and also depressed, but denied any hallucinations. The psychiatrist prescribed both Stelazine and Elavil for the petitioner. On March 17, 1986, the petitioner reported that he was continuing to experience depression and anxiety concerning his upcoming trial and the prospect of receiving the death penalty. The petitioner also expressed suicidal thoughts. The record reflects that the petitioner was again prescribed Stelazine and Elavil. The final entry in the Fortwood records pertaining to the petitioner's treatment is dated

May 14, 1986. On that date, the petitioner reported that he was sleeping well, his appetite was good, and he was no longer experiencing depression or nervousness. The petitioner was again prescribed both Stelazine and Elavil.

We note that, although the Fortwood records reflect that the petitioner was last seen by a counselor on May 14, 1986, his care at Fortwood was officially terminated on July 17, 1987, almost one year later. It is unclear from the Fortwood records whether the petitioner continued to receive medications, including Stelazine, during the intervening period of time. As noted previously, petitioner's trial counsel testified at the post-conviction evidentiary hearing that the petitioner was at least taking Elavil during this period of time. However, neither Mr. Hill nor Mr. Bryan could recall that the petitioner was taking Stelazine at the time of his trial.

Mr. Hill also testified at the post-conviction evidentiary hearing that, in addition to information from the federal penitentiary system and Fortwood, he had received reports from the jail prior to trial that the petitioner was yelling and throwing food, semen, feces and urine at guards and inmates passing by his cell. The petitioner also informed counsel prior to trial that he had completed a mind control course and could control people's behavior. In fact, following jury selection in his case, the petitioner stated to his attorneys that he felt comfortable with the jury, because several of the jurors were susceptible to his "intellectual power."

Yet, Mr. Hill also asserted that the petitioner appeared to be "completely competent, legally competent." Mr. Hill explained:

> In the federal penitentiary as a jailhouse lawyer, writ writer, [the petitioner] had . . . won some cases in the federal appellate courts and was very much aware of what the issues were in his case. . . . Mr. Wilcoxson would send out or request us to bring copies of cases, you know, on various issues. He was always actively

33

> involved and that's part of what I say was Mr.
> Wilcoxson's case. I was there to try to help him with it
> and do the things that lawyers can do but it was his case
> and he described how he wanted it run. . . .

According to Mr. Hill, the petitioner was able to refer his attorneys to relevant case law and propose ideas about the conduct of his defense which possessed some merit. Mr. Hill stated that, during trial, the petitioner's "social graces were a little rough," but he appeared to understand the proceedings, including making rational comments about the process during trial. The petitioner also appeared to understand the possible consequences of the proceedings, including the potential imposition of the death penalty. At one point, the petitioner noted that, even if convicted and sentenced to death, he would probably die of natural causes due to lengthy appellate proceedings.

Mr. Bryan also testified that, during the course of his representation, the petitioner did not appear to be mentally incompetent. Indeed, Mr. Bryan observed:

> Well, my dealings with Bobby, I never found Bobby to be
> incompetent. I found Bobby to be very manipulative and
> skillful at it. I think the incompetence that he has
> displayed is - - and I don't think he has intentionally
> displayed the incompetence. I can see where Bobby
> having spent many, many hours with him would be able
> to study and determine what he needed to tell someone
> to make them think he had any particular mental
> disorder. Bobby was a studier.

> * * *

> [H]e was very aware, very articulate. He had some
> cases for us. He was - - it was my understanding he was
> a certified federal jailhouse lawyer . . . . He was very
> articulate. He knew case names. It's not often that you
> go in and you sit down with your client and he is more
> conversant with case names than you are. . . . It was a
> little bit dated somewhat, his information, but I found him
> to be very bright and lived up to the articles that had
> been written about him in the past.

34

He concluded that the petitioner's claim of mental illness was

> absolutely bogus and I think Bobby is a lot smarter than anyone who interviewed him or would have treated him, and he is a lot more tenacious and I think his ability to stay with a plan of action is beyond anything that they comprehend.

Notwithstanding counsel's evaluation of the petitioner, we must conclude that counsel's failure to raise the issue of the petitioner's competency by requesting a psychiatric or psychological examination was not within the range of competence demanded of attorneys in criminal cases. In reaching this conclusion, we acknowledge that "'[t]here is no constitutional basis for a rule that would require a psychiatric evaluation in [every] capital case.'" Harbison v. State, No. 03C01-9204-CR-00125, 1996 WL 266114, at *8 (Tenn. Crim. App. at Knoxville, May 20, 1996)(citation omitted). Moreover, evidence of a defendant's past psychiatric problems does not necessarily require counsel to ask for a competency hearing if the petitioner's behavior does not reflect incompetence at the time of trial or while his attorney is preparing for trial. Keener v. State, No. 03C01-9410-CR-00374, 1994 WL 805878, at *2 (Tenn. Crim. App. at Knoxville, June 7, 1994). Nevertheless, we do not believe that we are stretching the boundaries of Strickland by holding that, when confronted with a client who has previously been diagnosed with schizophrenia and bipolar disorder, who was taking antipsychotic drugs until at least five months prior to trial, who claims powers of mind control on two occasions prior to and during trial, and who throws semen, feces, and urine at guards and fellow inmates, counsel should request a psychological examination before conforming the defense strategy to his client's dictates.

In so holding, we do not question the sincerity of counsel's belief that the petitioner was competent immediately prior to and during the trial. Indeed, we

note that the petitioner's records provide some support for Mr. Bryan's assessment of the petitioner's behavior. Nevertheless, in the context of counsel's duty to raise the issue of competency, courts have noted the """particularly critical interrelation between expert psychiatric assistance and minimally effective representation of counsel.""" Beavers v. Balcom, 636 F.2d 114, 116 (5th Cir. 1981). The United States Court of Appeals for the Fifth Circuit explained:

> Where a condition may not be visible to a layman, counsel cannot depend on his or her own evaluation of someone's sanity once he has reason to believe an investigation is warranted because, where such a condition exists, the defendant's attorney is the sole hope that it will be brought to the attention of the court.

Bouchillon, 907 F.2d at 597. See also Hull, 932 F.2d at 168-169 (when confronted with two recent psychiatric evaluations finding that his client was incompetent, counsel was not entitled to rely upon his own untrained observations to justify his failure to put the government to its proof at a competency hearing).

Having concluded that counsel's performance was deficient, we must still determine whether the petitioner is entitled to relief. As noted previously, the burden normally rests upon the petitioner in these post-conviction proceedings to demonstrate a reasonable probability that, but for counsel's defective performance, the result of the proceeding would have been different. In other words, the petitioner must demonstrate a reasonable probability that he was, in fact, incompetent to stand trial. However, the petitioner seeks to avoid this burden by asserting that a meaningful retrospective competency determination is not currently feasible due to the passage of time and the lack of psychological or psychiatric evidence contemporaneous to his trial. The petitioner cites Drope v. Missouri, 420 U.S. at 162, 95 S.Ct. at 896, for the proposition that, under these circumstances, reversal is the only appropriate remedy.

In order to better understand the petitioner's argument, we will briefly review the Drope decision and its application in the federal courts, in particular the Fifth Circuit Court of Appeals which has most extensively explored this issue. In Drope, 420 U.S. at 180, 95 S.Ct. at 908, the Supreme Court addressed a potential violation of its earlier holding in Pate v. Robinson, 383 U.S. at 385-386, 86 S.Ct. at 842, concerning the degree of a *trial court's* procedural due process obligation to sua sponte conduct a competency hearing during the course of trial proceedings. The Court in Drope concluded that a Pate violation had occurred and further concluded that, in light of the facts before the Court, a "nunc pro tunc" determination of competency could not adequately protect the petitioner's procedural due process rights. Id. at 183, 909. In refusing to allow the State to cure the Pate violation by conducting a retrospective competency hearing, the Court noted the "inherent difficulties of such a *nunc pro tunc* determination under the most favorable circumstances." Id.

In the context of federal habeas corpus proceedings, federal courts have declined to interpret the Pate and Drope decisions to prohibit retrospective competency determinations in all cases of Pate violations and, in fact, decline even to address the adequacy of a retrospective determination in the absence of some quantum of proof that the petitioner was incompetent at the time of trial. See, e.g., Lokos v. Capps, 625 F.2d 1258, 1261 (5th Cir. 1980); Thompson v. Johnson, 7 F.Supp.2d 848, 858 (S.D. Texas 1998). Generally, in order to trigger the right to a "meaningful" retrospective competency determination in collateral proceedings, a petitioner must demonstrate that the trial court received information which, objectively considered, should reasonably have raised a doubt about the defendant's competency. Lokos, 625 F.2d at 1261. See also Acosta v. Turner, 666 F.2d 949, 954 (5th Cir. 1982).

37

If a federal habeas petitioner demonstrates that a <u>Pate</u> violation has occurred, the burden of proof in essence shifts to the State to demonstrate that sufficient information is available to ensure a meaningful retrospective competency determination. Potential sources of information include the following:

1. Observations of the trial judge.
2. Observations and opinions of trial counsel.
3. Observations and opinions of the prosecuting attorney.
4. Psychological or psychiatric evidence contemporaneous to trial.
5. The trial record.
6. Observations and opinions of other individuals who interacted with the defendant at or near the time of trial.

<u>United States v. Renfroe</u>, 678 F.Supp. 76, 78 (D. Delaware 1988); <u>Stokes v. United States</u>, 538 F.Supp. 298, 307 (N.D.Ind. 1982). The absence of psychological or psychiatric evidence will not necessarily render a retrospective determination "impossible or even more difficult." <u>Id.</u> No one source of information is determinative and the weight of each will vary from case to case. <u>Id.</u> Only if, upon examining the available information, the court decides that a meaningful retrospective determination is impossible, must the court reverse the petitioner's conviction and remand the case for a new trial. See <u>Zapata v. Estelle</u>, 588 F.2d 1017,1020 (5th Cir. 1979).

In the instant case, the petitioner asks this court to graft the above analysis, applicable to a procedural due process claim under <u>Pate v. Robinson</u>, 383 U.S. at 385-386, 86 S.Ct. at 842, onto a claim of ineffective assistance of counsel under <u>Strickland v. Washington</u>, 466 U.S. at 687-697, 104 S.Ct. at 2064-2069. However, it is far from clear to this court that, when a petitioner demonstrates that counsel, instead of the trial court, possessed or should have possessed a reasonable doubt of the petitioner's competency and failed to request a psychological or psychiatric examination, the burden of proof shifts to the State to

demonstrate the feasibility of a retrospective competency determination in post-conviction proceedings.  In fact, Strickland generally requires that the burden of proving prejudice remain with the petitioner.  Id. at 693, 2067.

We do acknowledge the Supreme Court's observation in Strickland that, in certain Sixth Amendment contexts, a defendant may be relieved to varying degrees of his burden to affirmatively prove prejudice.  Id. at 692, 2067.  The Court listed such categories of claims as the actual or constructive denial of counsel altogether, the State's interference with counsel's assistance, and counsel's actual conflict of interest.  Id.  However, we decline to add the petitioner's claim to this list.

In reaching this conclusion, we note that the same Fifth Circuit that applies the above analysis in cases of Pate violations has declined to require a determination of whether a meaningful competency hearing can be held in the context of claims of ineffective assistance of counsel, Theriot v. Whitley, 18 F.3d 311, 313-314 (5th Cir. 1994), and even in the context of substantive as opposed to procedural due process challenges to a federal habeas corpus petitioner's competence at the time of his trial, Zapata, 588 F.2d at 1020.  See also Carter v. Johnson, 131 F.3d 452, 459 n.10 (5th Cir. 1997)(comparing procedural and substantive due process analyses).  The Fifth Circuit explained that, in cases of Pate violations, the State is responsible for the absence of a competency hearing at a time when a meaningful hearing could have been held.  Zapata, 588 F.2d at 1020. Accordingly, in those cases, the State should bear some responsibility for whatever difficulties the defendant may encounter in proving incompetency.  Id.  See also Stokes, 538 F.Supp. at 304 ("[w]here either the court or the government had a duty to act in regard to establishing the defendant's competency to stand trial, and each failed to do so, then the petitioner will not be further prejudiced by placing upon him

39

the burden to prove incompetency in the habeas action"). In contrast, in cases of ineffective assistance of counsel, the State bears no responsibility for the absence of a determination of competency at the time of trial. But see Johnson, 395 N.W.2d at 176 (when counsel fails to bring the issue of competency to the court's attention, and there is reason to doubt the defendant's competence to stand trial, a defendant may be entitled to a new trial if a meaningful nunc pro tunc competency hearing is not possible).

We conclude that, in the context of post-conviction claims that trial counsel rendered ineffective assistance by failing to raise the issue of competency, the burden must remain upon the petitioner to establish a reasonable probability that he was, in fact, incompetent at the time of his trial. We will, therefore, examine the record before this court to determine if the petitioner has carried his burden.

According to the record in this case, the petitioner perhaps suffers from either bipolar disorder or schizo-affective disorder and has at times been incompetent, including upon admission to DeBerry in 1996 and, generally, during these post-conviction proceedings. However, petitioner's post-conviction counsel declined at the post-conviction evidentiary hearing to ask either Dr. Mayer or Dr. Blair whether the available records reflected the petitioner's incompetence at the time of his trial. Moreover, as noted earlier, Dr. Mayer testified that the severity of the petitioner's mental illness varies depending not only upon whether the petitioner is taking his medications but also upon the "course of his illness." Dr. Blair further stated that even patients suffering from the same psychosis range along a "continuum of dysfunction," some patients being more competent than others. She noted that the petitioner's records reflect that he is generally capable of planning and capable of understanding the consequences of his behavior.

The record does suggest that the petitioner was not taking Stelazine at the time of trial. However, in marked contrast to the record of the post-conviction evidentiary hearing, the record of trial proceedings is devoid of interruptions or interjections by the petitioner reflecting mental illness.[8] Additionally, although Mr. Hill testified concerning reports from the jail that the petitioner was yelling and throwing food, semen, feces, and urine at guards and inmates, Mr. Hill did not testify concerning the frequency of these incidents. Moreover, the petitioner did not submit testimony or records from the Hamilton County Jail reflecting the petitioner's behavior prior to and during his trial. Officer Phillips, who first encountered the petitioner in 1990, testified that inmates in prison commonly engage in such behavior. She additionally noted that the petitioner engaged in this type of behavior more frequently that the average inmate. However, she observed that the petitioner appeared capable of controlling his behavior. Similarly, Officer Anderson, who first encountered the petitioner in 1992, testified that the petitioner would control his behavior if the officer gave him cigarettes or coffee.

More troubling to this court is Mr. Hill's testimony that, on two occasions, the petitioner asserted that he possessed special powers of mind control. Again, the touchstone of rational understanding is sufficient contact with reality. Lafferty, 949 F.2d at 1551. Nevertheless, counsel also testified that, notwithstanding these two isolated statements, the petitioner fully participated in his defense, including researching legal issues and offering useful suggestions. In fact, Mr. Hill testified that the petitioner was more capable of assisting counsel than the average client. Moreover, the petitioner appeared to understand the proceedings and the potential consequences of the proceedings, making rational observations

---

[8]As noted by the petitioner in his brief, petitioner's trial counsel did testify during the post-conviction evidentiary hearing that the petitioner would blow his nose in his hands during trial and wipe his hands on his clothing. However, we disagree with the petitioner that this conduct raises serious doubts concerning his competency.

41

during the trial.

While a defense attorney renders deficient performance by relying upon his own evaluation of a defendant's competency in the face of evidence to the contrary, the attorney's observations are nevertheless highly probative on the issue of competency in fact. Thus, the United States Court of Appeals for the District of Columbia has observed that "counsel's first-hand evaluation of a defendant's ability to consult on his case and to understand the charges and proceedings against him may be as valuable as an expert psychiatric opinion on his competency." United States v. David, 511 F.2d 355, 360 (D.C. Cir. 1975). See also Hernandez v. Ylst, 930 F.2d 714, 717 (9th Cir. 1991)(while not determinative, "a defendant's counsel is in the best position to evaluate a client's comprehension of the proceedings"); Kinder, 512 N.Y.S.2d at 599 ("[o]bviously, trial counsel has the best opportunity to provide evidence concerning the ability of his client to consult with counsel and understand the proceedings against him").

Finally, we acknowledge that the petitioner attempted to commit suicide shortly after the conclusion of the guilt/innocence phase of his trial. However, the United States Supreme Court has noted that

> 'the empirical relationship between mental illness and suicide' or suicide attempts is uncertain and . . . a suicide attempt need not always signal 'an inability to perceive reality accurately, to reason logically and to make plans and carry them out in an organized fashion.'

Drope, 420 U.S. at 181, 95 S.Ct. at 908 n. 16. Similarly, mental illness does not necessarily preclude competence to stand trial. Bouchillon, 907 F.2d at 593. The burden was upon the petitioner in these post-conviction proceedings to demonstrate a reasonable *probability* that he was incompetent at the time of his trial. We must conclude that the petitioner has failed to demonstrate prejudice warranting relief.

42

### ii. Insanity Defense or a Claim of Diminished Capacity

The petitioner also argues that his counsel were ineffective for failing to raise the defense of insanity or a claim of diminished capacity during the guilt/innocence phase of his trial. Alternatively, he contends that counsel should have presented evidence that the petitioner was suffering from a mental illness at the time of his incriminating conversation with Mr. Lewis and Officer Cooper. Moreover, he contends that counsel's decision to forego these tactics was not a strategic decision in the absence of any psychological or psychiatric evaluation of the petitioner.

At the time of the petitioner's trial, it was an affirmative defense to criminal conduct if a defendant was suffering from a mental disease or defect at the time of the offense and his illness prevented him from appreciating the wrongfulness of his conduct or from conforming his conduct to the requirements of the law. State v. Clayton, 656 S.W.2d 344, 346 (Tenn. 1983); Graham v. State, 547 S.W.2d 531, 543 (Tenn. 1977). Moreover, although the law presumes sanity, when a defendant presented evidence tending to show insanity at the time of the commission of the offense, the burden of proof shifted to the State to establish the defendant's sanity beyond a reasonable doubt. State v. Estes, 655 S.W.2d 179, 184 (Tenn. Crim. App. 1983). See also State v. Overbay, 874 S.W.2d 645, 650 (Tenn. Crim. App. 1993).

With respect to a potential claim of diminished capacity, the law in Tennessee was less clear. State v. Phipps, 883 S.W.2d 138, 146-148 (Tenn. Crim. App. 1994). In Phipps, 883 S.W.2d at 146, we noted that, "[w]ithout any detailed analysis, Tennessee courts [have] on occasion stated that 'the defense of diminished capacity is not recognized in Tennessee.'" However, we also reviewed a line of cases in Tennessee extending back in time to 1930 which implicitly approved

the use of evidence of a defendant's mental state to negate the requisite mens rea of an offense. Id. at 147-148. This court then concluded:

> This entire line of cases . . . , though frequently not using the term "diminished capacity," supports the conclusion that evidence of an accused's state of mind at the time of the offense is admissible in Tennessee to negate the existence of the requisite element of intent.

Id. at 148. See also State v. Hall, 958 S.W.2d 679, 688-690 (Tenn. 1997), cert. denied, __ U.S. __, 118 S.Ct. 2348 (1998); State v. Abrams, 935 S.W.2d 399, 402 (Tenn. 1996). In short, this court in Phipps did not announce a new rule of law, but merely clarified existing precedent. See, e.g., State v. Denton, 938 S.W.2d 373, 377 (Tenn. 1996); Meadows v. State, 849 S.W.2d 748, 751 (Tenn. 1993). Accordingly, both a defense of insanity and a claim of diminished capacity were available to the petitioner's counsel at the time of his trial.

Again, this is *not* a case in which counsel failed to conduct any investigation of the petitioner's history of mental illness prior to rejecting the feasibility of a mental state defense. Nevertheless, this court has previously held:

> Where counsel (1) makes some exploration of the mental history of the appellant but fails to take an obvious and easily available step which would have made such a defense viable, (2) does not produce reasonable tactical reasons for not pursuing further investigation, and (3) raises no other plausible defense, courts may find ineffective assistance of counsel.

Smith, No. 02C01-9801-CR-00018, 1998 WL 899362, at *22. Thus, counsel's decision to request or forego a psychological or psychiatric examination in investigating the feasibility of a mental state defense must be viewed in the context of the United States Supreme Court's decision in Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087 (1985). In Ake, 470 U.S. at 74, 105 S.Ct. at 1091-1092, the Court held that, when a defendant makes a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that

44

the State provide access to a psychiatrist's assistance if the defendant cannot afford one. See also Cooper v. State, 847 S.W.2d 521, 529 (Tenn. Crim. App. 1992)(citing Bertolotti v. Dugger, 883 F.2d 1503 (11th Cir. 1989)). Moreover, as noted earlier, Tenn. Code. Ann. § 33-7-301 provided that a court may order an evaluation of a criminal defendant whenever there is a question as to his mental capacity at the time of the offense.

In this case, counsel testified that the petitioner informed counsel that he would not submit to a psychological examination and did not wish to raise either an insanity defense or a claim of diminished capacity or introduce any evidence suggesting mental illness. Again, in Zagorski, 983 S.W.2d at 658-661, our supreme court held that a *competent* defendant has exclusive authority to make the ultimate decisions about his case, once having been fully informed of the rights and the potential consequences involved. We have already noted counsel's deficient performance in failing to ensure the competence of their client prior to relying upon his dictates in conducting his defense in a capital trial. However, we have also noted that the record does not support a conclusion that the petitioner was incompetent at the time of trial.

In any event, Mr. Bryan testified that he agreed with the petitioner's assessment of the viability of a mental state defense. According to Mr. Bryan, the presentation of such a defense would have required an acknowledgment of guilt. Mr. Bryan asserted that the petitioner's best defense was to emphasize the lack of any physical evidence that the petitioner was present at the scene of the crime. Additionally, Mr. Bryan noted that the State's evidence reflected a contractual killing, planned over the course of several months. Mr. Bryan concluded that, in this context, presenting a mental state defense would have been "absurd." Mr. Bryan

45

also asserted that portions of the records pertaining to the petitioner's history of psychological or psychiatric treatment were prejudicial. Specifically, he recalled that two notations in the Fortwood records, that the petitioner's mood had "lightened," arguably corresponded with the two occasions on which he was hired to commit a murder. Finally, Mr. Bryan indicated that his review of relevant records and his interaction with the petitioner led him to believe that a mental state defense was not feasible.

Thus, the question before this court is whether reasonable professional judgment supported counsel's decision to forego further investigation of a mental state defense, including requesting a psychological or psychiatric examination of the petitioner. Strickland, 466 U.S. at 691, 104 S.Ct. at 2066; Smith, No. 02C01-9801-CR-00018, 1998 WL 899362, at *22. We are admittedly troubled by counsel's assertions that a claim of actual innocence was the petitioner's best defense.[9] The petitioner's recorded statements to Mr. Lewis and Officer Cooper were devastating to any claim of actual innocence. Moreover, we are not convinced that proof of a contractual murder per se precludes any mental state defense, particularly in light of evidence at trial that the petitioner's brother was a significant if not primary actor in the commission of this offense. Also, the fact that records of past psychological or psychiatric treatment are not uniformly helpful to a defendant does not necessarily rule out further investigation.

However, we must acknowledge that the Fortwood records offer no evidence of insanity or diminished capacity at the time of the offense. While counsel were not entitled to rely upon their own beliefs about the petitioner's mental

---

[9]Interestingly and somewhat inconsistently, Mr. Bryan also testified at the post-conviction evidentiary hearing that he could not ethically have interposed a defense of actual innocence. Yet, the record clearly reflects that defense counsel did rely primarily upon this defense at trial.

condition at the time of the murder in light of contrary evidence, <u>Wood v. Zahradnick</u>, 578 F.2d 980, 982 (4th Cir. 1978), there was very little contrary evidence. The Fortwood records indicate that the petitioner was taking Stelazine at the time of the murder. The records further reflect that the Stelazine was effective in controlling the petitioner's symptoms. Moreover, the entries prior to and following Mr. Mosher's murder reflect no significant mental disturbance. Finally, we note that petitioner's post-conviction counsel declined at the post-conviction evidentiary hearing to ask either Dr. Mayer or Dr. Blair whether he or she could determine from the available records the petitioner's mental state at the time of the offenses.

Nevertheless, with respect to a defense of insanity, if counsel had sought a psychological or psychiatric evaluation, such evidence might have shifted the burden of proof to the State to prove the petitioner's sanity at the time of the offense. <u>But cf.</u> <u>Forbes v. State</u>, 559 S.W.2d 318, 325 (Tenn. 1977)(in applying the <u>M'Naghten</u> rule to a defendant suffering from paranoid schizophrenia, the supreme court noted that his condition was episodic or cyclical and, therefore, held that the defendant could only establish a prima facie case of insanity by proof that he was not in remission at the time of his offense). Moreover, in light of the petitioner's history of mental illness and his incriminating statements to Mr. Lewis and Officer Cooper, it is certainly arguable that counsel should have further explored the option of a mental state defense. <u>See, generally</u>, <u>Webb v. State</u>, No. 03C01-9606-CC-00211, 1997 WL 33663, at **5-7 (Tenn. Crim. App. at Knoxville, January 28, 1997).

In any case, regardless of whether counsel's performance was deficient, the record does not reflect a reasonable probability that the petitioner was insane or possessed diminished capacity at the time of the offense. Indeed, Mr. Redick conceded at the post-conviction evidentiary hearing that he had heard no

proof that would support either an insanity defense or a claim of diminished capacity. "[T]he mere possibility of success based on a defense for which there existed little or no evidentiary support is not enough to establish constitutionally inadequate counsel." Long v. Krenke, 138 F.3d 1160, 1162 (7th Cir. 1998).

The petitioner also argues that, even if an insanity defense or a claim of diminished capacity was not feasible, counsel should have sought expert assistance in evaluating the petitioner's mental state at the time of his incriminating conversation with Mr. Lewis and Officer Cooper and should have presented at trial evidence concerning his mental state. As noted previously, the Fortwood records reflect that the petitioner attempted to commit suicide shortly before the recorded conversation. However, the records also reflect that, the day before the conversation, the petitioner's counselor noted:

> It appears that suicidal gesture (if true) was an attention getting gesture and there does not appear to be any reason for concern at this time.

Moreover, on December 18, 1985, four days after the petitioner's acceptance of the contract to commit a murder in Atlanta, Georgia, the counselor recorded:

> The petitioner was in good spirits. He appeared to enjoy discussing his attempted suicide and stated that it had been a crisis situation - everything coming down on him at one time. As he talked about the overdose, which is questionable, got the impression he had rather enjoyed the whole episode.
>
> Verbalized the financial difficulties he is now facing, and the "humility" of the situation.

Additionally, the recorded conversation itself does not reflect that the petitioner's statements stemmed from any psychological disturbance. Indeed, when initially approached by Eddie Cooper, the petitioner refused to speak with him concerning the Mosher murder. He only relented upon meeting with his long time

48

acquaintance, Mr. Lewis.  Moreover, during the conversation itself, the petitioner

expressed his awareness of the risk inherent in speaking with anyone about the

Mosher murder.  He remarked:

> All a man's got to get up in court and say that he told me
> so and so and you live with it.
> * * *
> Whether it's the . . . truth or not.  All a man's got to get up
> and say he told me this or that . . . and that is no longer
> hearsay because that come right from your mouth.

In short, even assuming that counsel's performance was deficient, we must again

conclude that the petitioner has failed to establish prejudice.


### iii. Additional Allegations of Ineffective Assistance of Counsel

Initially, the petitioner broadly asserts that counsel were ineffective in

failing to request and obtain expert and investigative assistance, in failing to present

all available evidence concerning the petitioner's innocence, and in failing to rebut

the State's case.  However, as noted by the post-conviction court in its findings of

fact and conclusions of law, the petitioner has failed to allege any specific omissions

by defense counsel in investigating and presenting his case other than counsel's

failure to investigate and present evidence concerning the petitioner's competency

at trial and his mental condition at the time of the offense.  Accordingly, these issues

do not conform to Tenn. R. App. P. 27(a)(4) and are waived.  As we have previously

noted in addressing issues too broad in scope, "'[t]o answer such a query requires a

degree of clairvoyance with which this Court is not possessed.'" State v. Dykes, 803

S.W.2d 250, 254 (Tenn. Crim. App. 1990); State v. Birdsong, No. 01C01-9503-CR-

00060, 1995 WL 392911, at *1 (Tenn. Crim. App. at Nashville, July 6, 1995).


Moreover, we agree with the State that the petitioner has waived the

remaining allegations of ineffective assistance of counsel due to his failure to

49

provide argument, citation to authority, or references to the record in support of these allegations. Ct. of Crim. App. Rule 10(b); Tenn. R. App. P. 27(a)(7). In any event, these allegations are without merit.

### a. Counsel's Performance During Voir Dire

The petitioner first contends that counsel were ineffective in failing to object to the exclusion of jurors opposed to capital punishment and in failing to exclude jurors who indicated that they would impose the death penalty in every case. It is unclear whether the appellant is alleging deficient performance and prejudice during the guilt/innocence phase of his trial. In the event that the petitioner's claim implicates the guilt/innocence phase, we agree with the post-conviction court that the record does not support the petitioner's allegations. Moreover, our supreme court has previously rejected claims that the mere process of "death qualifying" prospective jurors produces a jury biased in favor of the State on the issue of guilt or innocence. State v. Hall, 958 S.W.2d 679, 717 (Tenn. 1997); State v. Teel, 793 S.W.2d 236, 246 (Tenn. 1990).

### b. Failure to Adequately Advise the Petitioner Concerning the Option of Testifying During his Trial

The petitioner next alleges that counsel failed to adequately advise him concerning the option of testifying at trial. This court has recently held that "[a] defendant should personally make the decision whether to testify after receiving counsel's careful and thorough advice as to the benefits and detriments of placing the defendant's testimony before the jury." State v. Momon, No. 03C01-9605-CR-

00187, 1997 WL 772903, at *9 (Tenn. Crim. App. at Knoxville, December 9, 1997), perm. to appeal granted, (Tenn. 1998). Mr. Hill testified at the post-conviction evidentiary hearing:

> Mr. Wilcoxson knows the Fifth Amendment as well as anyone in the room. As I say, he was very active as a writ writer when he was in the federal system. We discussed all aspects of the trial . . . including testifying or not and he was adamant that he couldn't testify because - - obviously in the guilt phase because of his prior record.

The petitioner adduced no evidence at the post-conviction evidentiary hearing that counsel failed to fully advise him of the benefits and detriments of testifying. We have already held that, while counsel rendered deficient performance in failing to further investigate the petitioner's competency to stand trial, the record does not reflect a reasonable probability that the petitioner was incompetent at the time of his trial, precluding his ability to make the ultimate decisions about his case.

Furthermore, this court has previously noted that the following factors tend to indicate whether the failure of a defense attorney to call the defendant to testify constitutes ineffective assistance:

> (1) only the victim and the defendant were present when the offense was committed;
> (2) only the defendant could present a "full version of [his] theory of the facts";
> (3) the defendant's testimony could not be impeached by prior criminal convictions;
> (4) the defendant could give an account of the relationship with the victim;
> (5) the attorney had let in objectionable, prejudicial testimony with the intention of clarifying it with the testimony of the defendant.

Bates v. State, 973 S.W.2d 615, 636 (Tenn. Crim. App. 1997)(citing State v. Zimmerman, 823 S.W.2d 220, 227 (Tenn. Crim. App. 1991)). However, this court is somewhat hampered in applying these factors to the petitioner's case by the lack of

51

any indication in the record of what the petitioner's testimony would have been had he testified. See Momon, No. 03C01-9605-CR-00187, 1997 WL 772903, at *11 ("[d]espite the obvious importance of any defendant's testimony, it would be sheer speculation to evaluate the potential impact of [a defendant's] testimony absent some knowledge of what that testimony would have been"). Indeed, the only testimony at the post-conviction evidentiary hearing that arguably hinted at the content of the petitioner's testimony was defense counsel's assertion that he could not ethically have interposed a defense of actual innocence. Obviously, this testimony is of no assistance to the petitioner in establishing prejudice. This issue is without merit.

### c. Failure to Object to the Trial Court's Instruction on Reasonable Doubt

The petitioner additionally contends that counsel were ineffective in failing to object to the trial court's instruction on reasonable doubt. The trial court provided the following instruction to the jury:

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean a doubt that may arise from possibility, or an imaginary or captious doubt. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required, and this moral certainty is required as to every proposition of proof requisite to constitute the offense.

This is a correct statement of the burden of proof required for criminal trials in Tennessee. State v. Hall, 976 S.W.2d 121, 159 (Tenn. 1998), cert. denied, ___ U.S. ___, 119 S.Ct. 1501 (1999); State v. Bush, 942 S.W.2d 489, 520-521 (Tenn.), cert. denied, ___ U.S. ___, 118 S.Ct. 376 (1997); Scott v. State, No. 01C01-9709-CR-00400, 1999 WL 233643, at **9-10 (Tenn. Crim. App. at Nashville, April 20, 1999); State v. Cowart, No. 03C01-9512-CR-00402, 1999 WL 5174, at *23 (Tenn. Crim.

52

App. at Knoxville), perm. to appeal denied, (Tenn. 1999); Lane v. State, No. 02C01-9604-CC-00133, 1998 WL 756746, *7 (Tenn. Crim. App. at Jackson, October 30, 1998), perm. to appeal denied, (Tenn. 1999).  Accordingly, the petitioner has failed to establish his allegation of ineffective assistance of counsel.

**d.**    **Failure to Allege Ineffective**
**Assistance of Counsel in**
**the Motion for New Trial and**
**on Direct Appeal**

The petitioner also asserts that counsel were ineffective in failing to allege ineffective assistance of counsel in the motion for new trial and on direct appeal.  However, our supreme court has previously held that there is no constitutional requirement that an attorney argue every issue on appeal.  Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993).  This principle is particularly applicable to the issue of ineffective assistance of counsel, because a defendant does not waive the issue for post-conviction purposes by failing to raise it in his motion for new trial and on direct appeal.  Cf. Thompson v. State, 958 S.W.2d 156, 161-162 (Tenn. Crim. App. 1997); State v. Franz, No. 03C01-9509-CC-00269, 1998 WL 46432, at *9 (Tenn. Crim. App. at Knoxville), perm. to appeal denied, (Tenn. 1998); Brewer v. State, No. 02C01-9701-CC-00400, 1998 WL 749417, at *3 (Tenn. Crim. App. at Jackson, October 28, 1998); State v. Beard, No. 03C01-9502-CR-00044, 1996 WL 563893, at *2 (Tenn. Crim. App. at Knoxville, September 26, 1996); State v. Sluder, No. 1236, 1990 WL 26552, at *7 (Tenn. Crim. App. at Knoxville, March 14, 1990).

**e.**    **Counsel's Withdrawal from**
**the Petitioner's Case During**
**Direct Appellate**
**Proceedings**

Finally, the petitioner alleges that Mr. Bryan rendered ineffective assistance because he withdrew as petitioner's counsel during the direct appellate

proceedings in order to accept employment with a district attorney general's office. Mr. Hill testified that, during the direct appeal, Mr. Bryan withdrew and accepted employment with the district attorney general's office in another judicial district. The court then appointed Hal Clements, "a well-respected, local attorney," to assist Mr. Hill. Mr. Bryan also confirmed that, while the petitioner's case was pending on direct appeal, he withdrew from the case and accepted employment as an assistant district attorney general in a different judicial district.

An absolute right to conflict-free representation of counsel is inherent in the Sixth Amendment to the United States Constitution and Article 1, § 9 of the Tennessee Constitution. Hedges v. State, No. 03C01-9112-CR-00379, 1993 WL 73723, at *3 (Tenn. Crim. App. at Knoxville, March 10, 1993). However, in order to demonstrate a violation of the right to counsel, the petitioner must establish "either an actual conflict of interest or a possible conflict which adversely affected his lawyer's performance." Id. See also Netters v. State, 957 S.W.2d 844, 847 (Tenn. Crim. App. 1997).

We conclude that the petitioner has failed to demonstrate an actual conflict of interest. Contrast State v. Phillips, 672 S.W.2d 427 (Tenn. Crim. App. 1984)(appellant demonstrated an actual conflict of interest when defense counsel withdrew from the appellant's case, accepted employment with the district attorney general's office in the same district, and performed "clerical" work in the appellant's case on behalf of his new employer). Moreover, he has failed to demonstrate that Mr. Bryan's conduct on appeal violated Sup. Ct. Rule 8, DR 2-110 or in any way affected the outcome of his case. This issue is without merit.

B.          **Previous Determination and Waiver**

The petitioner's remaining issues have been previously determined on direct appeal or have been waived due to the petitioner's failure to raise the issues in prior proceedings. Accordingly, the remaining issues are not cognizable in these post-conviction proceedings. Tenn. Code. Ann. § 40-30-111 (1990); Tenn. Code. Ann. § 40-30-112 (1990).

### III. Conclusion

For the foregoing reasons, we affirm the judgment of the post-conviction court.

_____
Norma McGee Ogle, Judge

CONCUR:

_____
Gary R. Wade, Presiding Judge

_____
Cornelia A. Clark, Special Judge

55