# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### September 27, 2011 Session

## FRED ALLEN OWENS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 81653     Jon Kerry Blackwood, Senior Judge**

---

### No. E2011-01190-CCA-R3-PC - Filed March 12, 2012

---

The Petitioner, Fred Allen Owens, appeals as of right from the Knox County Criminal Court's denial of his petition for post-conviction relief. The Petitioner contends that he received ineffective assistance of trial counsel because counsel failed to investigate and present a mental health defense. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Robert L. Vogel, Knoxville, Tennessee, for the appellant, Fred Allen Owens.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Randall Eugene Nichols, District Attorney General; Ta Kisha M. Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND

*I. Evidence at Trial*

On August 26, 2001, Melissa Bell discovered the body of Gene Fleenor on the floor of his living room. State v. Fred Allen Owens, No. E2003-02003-CCA-R3-CD, 2004 WL 1159546, at *1 (Tenn. Crim. App. May 25, 2004), perm. app. denied, (Tenn. Nov. 8, 2004). Ms. Bell went to the victim's house after receiving a concerning phone call from her sister,

Melinda Reilly.[1] During their conversation, Ms. Bell overheard the Petitioner tell Ms. Reilly to "hang up the phone" because Ms. Bell was "going to call the police" and "turn them in." Id. Ms. Bell tried calling the victim's house and got no answer. Ms. Bell called Ms. Reilly back and informed her that she was going to the victim's house. Ms. Reilly began crying and begged Ms. Bell not to "go over there." Ms. Bell again heard the Petitioner in the background telling Ms. Reilly to hang up the phone because he feared that Ms. Bell would turn them in to the police. Ms. Bell then went to the victim's house where she discovered his body and called 911.

In the victim's driveway, police discovered "a reddish stain" and markings "that were consistent with someone who was bloody being drug." Owens, 2004 WL 1159546, at *2. Subsequent tests revealed that the stain was the victim's blood. Id. at *3. There was no blood found in the victim's living room or any signs of a struggle. Id. at *2. The police also believed that the victim had been dragged into the residence "because his shirt was pulled up and his pants were down around his hips." A search of the Petitioner's home uncovered the victim's wallet and glasses, as well as a sheet, tissues, and a pair of jeans with the victim's blood on them. Id. at *2-3. There was also a telephone found in the living room that had the victim's blood on it. Id. at *2-3. Police also found a fingerprint belonging to the victim on the telephone. Id. at *2.

On August 27, 2001, Ms. Bell received another phone call from Ms. Reilly. Owens, 2004 WL 1159546, at *1. Ms. Bell heard the Petitioner in the background telling Ms. Reilly to hang up the phone because it was "tapped." Ms. Bell provided Detective Tom Cox with the phone number Ms. Reilly had called her from, and Detective Cox was able to trace the number to the Johnson City area. Id. at *2. Detective Cox traveled to Johnson City and was able to apprehend the Petitioner and Ms. Reilly. The shoes both the Petitioner and Ms. Reilly were wearing when they were arrested were found to have the victim's blood on them. Id. at *2-3. Detective Cox also seized the Petitioner's car in Johnson City and drove it back to Knoxville. Id. at *2. During the drive, Detective Cox's "trousers got soaked with what appeared to be blood mixed with a clear liquid." Id. (quotation marks omitted). Police subsequently found the victim's blood on the driver's seat, the passenger door, and the passenger door handle of the Petitioner's car. Id. at *3.

The police videotaped their interview with the Petitioner, and the videotape was played for the jury at trial. Owens, 2004 WL 1159546, at *3. The Petitioner told the police that he had picked the victim up on the afternoon of Saturday, August 25, and that he had taken the victim to the liquor store. After going to the liquor store, the Petitioner and the victim returned to the Petitioner's home where they proceeded to drink with Ms. Reilly.

---

[1]Ms. Reilly was the Petitioner's girlfriend at the time and his co-defendant in this case.

According to the Petitioner, the victim began arguing with Ms. Reilly and using "a nasty mouth." During the argument, the victim stated that he had previously "molested" Ms. Reilly and called her a "bitch" and a "whore." According to the Petitioner, Ms. Reilly "smacked" the victim in the face. The Petitioner told the police that the victim then got up and tripped over the coffee table. The Petitioner said that he told the victim to sleep in the floor and leave Ms. Reilly alone, but the victim continued to harass her. According to the Petitioner, "Ms. Reilly then picked up a skillet from a box and struck the victim in the back of the head with it." The Petitioner claimed that Ms. Reilly "then placed a pillow under the victim's head, to which the victim said, 'thank you,' and then began snoring." The Petitioner stated that Ms. Reilly "also struck the victim in the face with her fist." The Petitioner admitted that he "struck the victim in the back of the head twice with his open hand" because the victim had insulted his mother. The Petitioner told the police that he and Ms. Reilly "took the victim back to his home that evening and carried him in because he was drunk," but the Petitioner denied knowing that the victim was dead. The Petitioner claimed that he and Ms. Reilly "went to Johnson City to visit someone in the hospital."

Ms. Bell described the victim as "a little-bitty tiny man" and testified that he "drank a lot and was in poor health." Owens, 2004 WL 1159546, at *1. The medical examiner, Dr. Sandra Elkins, testified the victim was suffering from several medical conditions at the time of his death, including "severe heart disease; emphysema; cirrhosis of the liver; chronic pancreatitis; changes in the kidney suggestive of high blood pressure; an enlarged prostate; and cerebral atrophy, or shrinkage of the brain." Id. at *4. Dr. Elkins opined that several of these conditions were "consistent with chronic alcohol abuse" and that the victim had a blood alcohol level of .23 percent at the time of his death. Dr. Elkins testified that the victim suffered multiple injuries to the left side of his head and neck and "exhibited external markings of strangulation." However, there were no injuries to the back of the victim's head. Dr. Elkins opined that the victim died from either strangulation, "a large subdural hematoma caused by blunt force head injuries to the left side of the victim's head," or a combination of the two causes. Dr. Elkins testified that the victim's brain atrophy "made him more prone to a subdural hematoma . . . from head trauma." Dr. Elkins concluded that "[t]he front of the victim's face and the left side of his head were where the trauma was focused." Dr. Elkins opined that the victim suffered at least three blows to the head and that the trauma could have been produced by kicking or stomping on the victim's head. Dr. Elkins also testified that the injuries to the victim's neck were consistent with "manual strangulation involving a sustained compressing force to both sides of the neck." Id. (quotation marks omitted). Dr. Elkins opined that the victim was already dead when he was placed in his living room. Dr. Elkins testified that she did not think the victim had been struck by a heavy blunt object swung with force because there was no evidence of skull fractures on the victim.

At trial, the Petitioner presented the deposition testimony of his 87-year-old aunt and neighbor, Ola Rudder. Owens, 2004 WL 1159546, at *5. Ms. Rudder testified that the Petitioner "drinks heavy" and "would fight" when he was drunk. Ms. Rudder also testified that the victim and the Petitioner were "friends" and that she was unaware of any problems between the two. On August 25, 2001, Ms. Rudder saw the victim and Ms. Reilly at the Petitioner's house. Ms. Rudder testified that all three were drinking and that the Petitioner and Ms. Reilly were "pretty drunk." At one point, Ms. Rudder overheard the Petitioner and Ms. Reilly "arguing because Ms. Reilly had said that she wanted to have sex with the victim." Ms. Rudder also recalled "seeing skillets on a table" in the Petitioner's living room. Ms. Rudder testified that she returned home and went to bed around 7:30 p.m. that night and "did not hear any fighting or anything coming from the [Petitioner's] house that night." Ms. Rudder also testified that after the Petitioner's arrest, he told her that the victim was alive when they dropped him off and that he and Ms. Reilly did not kill the victim. Id. at *6. Ms. Rudder further testified that she received a letter from Ms. Reilly which stated that she and the Petitioner did not kill the victim.

Zoe Ammons, another of the Petitioner's neighbors, testified on the Petitioner's behalf at trial. Owens, 2004 WL 1159546, at *6. Ms. Ammons testified that on August 25, 2001, she saw the victim and Ms. Reilly at the Petitioner's house and that all three were "under the influence of alcohol . . . quite a great bit." Id. (ellipsis in original). Ms. Ammons also recalled overhearing the Petitioner and Ms. Reilly arguing about the victim. Karen Carpenter also testified on the Petitioner's behalf. Ms. Carpenter testified that she cleaned the victim's home for him and that the victim "drank a lot, was very weak, and had fallen on occasion in his home." Ms. Carpenter also testified that on one occasion she saw the victim fall and hit his head.

The Petitioner was charged with premeditated first degree murder in the death of the victim. Owens, 2004 WL 1159546, at *6. Based upon the foregoing evidence, the jury convicted the Petitioner of the lesser-included offense of second degree murder. The trial court sentenced the Petitioner as a Range II, multiple offender to a 35-year sentence. Id. at *1. On appeal, this court affirmed the Petitioner's conviction. Id. at *11.

*II. Post-Conviction Proceedings*

On April 7, 2005, the Petitioner filed a timely pro se petition for post-conviction relief. Counsel was appointed and an amended petition was filed on January 19, 2007. The post-conviction court held a hearing in this matter on April 22, 2010 and August 18, 2010, with Judge Richard R. Baumgartner presiding. On February 22, 2011, the post-conviction court

entered an order denying post-conviction relief.[2]  The Petitioner filed a timely notice of appeal on March 10, 2011.

At the hearing, Dr. Peter Young, a psychologist practicing in Knox County, testified and presented the post-conviction court with a letter detailing his findings.  Based upon his review of the Petitioner's medical records from 1995 to 1998, Dr. Young opined that the Petitioner suffered from substance abuse, major depression, and "considerable anxiety."  Dr. Young testified that given the Petitioner's chronic alcohol abuse, it was "plausible to imagine that he may have [had] cognitive impairments" and "reasonable to suspect some type of dementia."  However, Dr. Young testified that a neuropsychological evaluation needed to be performed on the Petitioner in order to determine if he actually suffered from any cognitive impairments.  Dr. Young concluded that it "would seem pretty obvious" that the Petitioner should have had a mental evaluation prior to trial given the Petitioner's medical history.  Dr. Young testified that he had recently learned that the Petitioner received Social Security benefits as a result of a mental illness and that "would have made it even more clear that there [was] good reason that he should [have been] evaluated."

On cross-examination, Dr. Young admitted that he had never evaluated the Petitioner and that he could not conclude that at the time of the offense the Petitioner suffered from a mental disease or defect.  Dr. Young also admitted that because he did not "have enough information," there was "no way for [him] to know" if, at the time of the offense, the Petitioner "did not know right from wrong" or lacked the capacity to form intent.  Dr. Young testified that he was only offering an opinion "as to whether or not there was a reasonable amount of information to suggest that an investigation, evaluation by a medical person was warranted."

The Petitioner testified that he felt that trial counsel had been ineffective because of "just a whole lot of things."  The Petitioner claimed that trial counsel met with him only five times to discuss his case.  The Petitioner complained that the meetings were "very short[]" and testified that, "I have no proof saying this, but [trial counsel] is drinking each time he come see me.  I mean, I could tell it 'cause I'm a drunkard."  The Petitioner believed trial counsel was intoxicated because he would "come late at night" and because "[h]e call me on the cell, and he'd--the way he'd repeat his self and slur and stuff."  However, the Petitioner testified that he never detected the smell of alcohol on trial counsel's breath.  The Petitioner

---

[2]The matter was taken under advisement while the transcript of the proceedings was to be prepared with the post-conviction court set to announce its judgment in February 2011.  Prior to that date, Judge Baumgartner took an indefinite medical leave and ultimately retired.  Senior Judge Jon Kerry Blackwood, sitting by designation, reviewed the record and transcript in this matter, as well as the record of the Petitioner's original trial, before entering his order denying post-conviction relief.

also complained that trial counsel did not inform him "that if I went to trial and found [was] guilty, that they would enhance my time and give me a whole lot of time." The Petitioner asserted that he would have accepted the State's offer of a 15-year sentence had he known about the sentencing enhancement. The Petitioner also complained about several evidentiary issues that he claimed trial counsel failed to properly object to.

The Petitioner testified that he informed trial counsel that he had previously been treated at Peninsula Hospital, Overlook Mental Health Center, and Blount Memorial Hospital and "was under in treatment and out." The Petitioner complained that he told trial counsel that "he needed to talk to them people and try to get me evaluated or something." The Petitioner also testified that trial counsel was aware that he "had been drawing mental disability for about [8] years" and that he "made [trial counsel] power of attorney so he could cash" the Social Security checks while the Petitioner was in jail. The Petitioner testified that a "state psychiatrist" found him to be disabled due to his mental condition. The Petitioner testified that trial counsel never attempted to obtain his medical records, show that he was not competent to stand trial, or prove that he had a mental defect. When he asked trial counsel about his medical records, the Petitioner alleged that trial counsel told him "it won't help you" and said that "he wasn't worried about that." On cross-examination, the Petitioner testified that he had been committed to the psychiatric ward at Peninsula Hospital "on several occasions in . . . the ['90s]."

On cross-examination, the Petitioner recounted what he told the police. The Petitioner testified that the victim "started calling [the Petitioner's mother] bad names and it made me mad and I told [the] detective I smacked him two times on the side of the head." The Petitioner further explained that he "just blew up and walked over there and smacked . . . him in the side of the head a couple of times." When asked if he knew what he was doing when he smacked the victim in the head, the Petitioner responded "Yes, I wanted him to shut up and quit talking about my mother." The Petitioner testified that he did not intend to hurt or kill the victim. However, the Petitioner admitted that, at the time, he knew he "wasn't supposed to be hitting people" and that "hitting people" was a crime called assault.

Trial counsel testified that he originally began practicing law in Florida in 1960 and that he had been licensed in Tennessee since 1985. Trial counsel testified that at the time of the Petitioner's trial, he was an experienced trial attorney and had tried several murder and capital cases. According to trial counsel's records, he met with the Petitioner at least 35 times prior to trial. Trial counsel estimated that he met with the Petitioner "in excess of 40 hours prior to trial." Trial counsel explained that his "overall" trial strategy "was to minimize [the Petitioner's] participation in what happened." Trial counsel testified that he felt the best way to do this was to allow the Petitioner's statement to be admitted so the Petitioner could give his version of events without having to testify. Trial counsel believed that the Petitioner

-6-

"would not have been a very good witness" and was afraid that the Petitioner's prior convictions for armed robbery, assault and battery, and vehicular homicide would be admissible on cross-examination if the Petitioner testified. Trial counsel testified that he believed he provided the Petitioner with effective assistance of counsel because the Petitioner was convicted of the lesser-included offense of second degree murder and received a lesser sentence than he would have had he been convicted of premeditated first degree murder.

Trial counsel stated that the Petitioner told him that he "had problems with depression." Trial counsel also admitted that he deposited the Petitioner's Social Security checks for him and that the Petitioner had told him that he received the benefits because he had "a diagnosis and a disability due to depression." Trial counsel was also aware that the Petitioner "had a chronic alcohol condition" and a substance abuse problem. However, trial counsel did not seek to obtain the Petitioner's Social Security records or any of his medical records. Trial counsel also did not seek to have the Petitioner examined by a mental health expert. Trial counsel testified that he did not recall if the Petitioner told him that in 1998 the Petitioner had been committed to Peninsula Hospital "for depressed mood and suicidal ideation." Trial counsel also admitted that he was unaware that in January 2001, Dr. James Radford had diagnosed the Petitioner as suffering from "major depression with psychotic features."

Trial counsel explained that he did not investigate the Petitioner's mental condition because he "never . . . considered [the Petitioner] anything but lucid and able to communicate, and [he] never saw anything in [the Petitioner's] demeanor or in interacting with him that indicated to [trial counsel] [that the Petitioner] had any psychological problems of any significance." Trial counsel also believed that he "checked it out enough to know that all [the Petitioner] had was depression" and that he "didn't think that that was of any mitigating benefit whatsoever based on this charge and his conviction." Trial counsel testified that because his trial strategy was to argue that Ms. Reilly killed the victim, he did not feel that addressing the Petitioner's mental state "would have helped [his] case at all." Trial counsel also testified that "there was no telling what would" be exposed in addressing the Petitioner's mental condition and worried that it would expose the Petitioner's criminal history to the jury.

In its order denying relief, the post-conviction court concluded that the Petitioner's claim that trial counsel was ineffective for failing to investigate his mental condition was without merit. The post-conviction court accredited the testimony of trial counsel that the Petitioner "did not display any behavior to indicate any defense based upon a mental condition or lack of capacity." The post-conviction court also stated that Dr. Young's testimony did "not even support his assertion" and that Dr. Young "merely suggested that an evaluation might be helpful in determining [the] Petitioner's capacity." The post-conviction

court concluded that Dr. Young's testimony was "purely speculative." The post-conviction court also accredited trial counsel's testimony that evidence of the Petitioner's mental condition would not have assisted or would have hindered the Petitioner's trial strategy of minimalizing his role in the crime. The post-conviction court denied the Petitioner relief on this issue and all other issues raised in his pro se and amended petitions.

## ANALYSIS

### I. Trial Counsel's Failure to Investigate and Present a Mental Health Defense

The Petitioner contends that the post-conviction court erred in denying his petition for post-conviction relief. Specifically, the Petitioner contends that he established that trial counsel was ineffective for failing to investigate or present a mental health defense. The Petitioner argues that trial counsel was aware that he "had been diagnosed and found disabled because of his psychological illness." The Petitioner argues that this should have put trial counsel on notice to investigate further. The Petitioner also argues that trial counsel "had in his hand significant evidence that could have mitigated [the Petitioner's] actions" and that trial counsel "had psychological evidence that [the Petitioner] had hallucinations, was depressed with psychotic features, and was at the 'low-average' range of intellectual functioning." The State responds that the Petitioner failed to present any evidence at the post-conviction hearing that he suffered from a mental illness at the time of the offense. The State points out that Dr. Young was unable to form an opinion as to the Petitioner's mental condition at the time of the offense and that trial counsel testified that the Petitioner seemed lucid and competent at all of their meetings. The State further responds that the Petitioner has failed to establish that evidence of his mental health would have been admissible at trial. The State concludes that the Petitioner has failed to show that trial counsel was ineffective regarding this issue.

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that

counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance falls below a reasonable standard is not enough; rather, the petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

We begin by noting that the reasonableness of counsel's actions must be assessed on the facts of the particular case, viewed as of the time of counsel's conduct. Strickland, 466 U.S. at 689. This court will not allow hindsight to color its analysis nor will we second-guess reasonable professional judgments made by counsel. The Petitioner asserts that trial counsel "had psychological evidence that [the Petitioner] had hallucinations, was depressed with psychotic features, and was at the 'low-average' range of intellectual functioning" and that trial counsel "had in his hand significant evidence that could have mitigated [the Petitioner's] actions." Trial counsel testified that he knew at the time of trial that the Petitioner had a history of chronic alcohol and substance abuse, that the Petitioner received Social Security benefits for a mental disability caused by depression, and that the Petitioner was lucid and able to communicate with trial counsel.

To the extent that Petitioner complains that trial counsel failed to seek a competency hearing, we note that evidence of a petitioner's "past psychiatric problems does not necessarily require counsel to ask for a competency hearing if the petitioner's behavior does not reflect incompetence at the time of trial or while his attorney is preparing for trial." Wilcoxson v. State, 22 S.W.3d 289, 310 (Tenn. Crim. App. 1999). Trial counsel testified that the Petitioner was lucid and able to communicate with him. Trial counsel further testified that the Petitioner's behavior did not suggest that he "had any psychological problems of any significance." Accordingly, trial counsel was not ineffective for failing to seek a competency hearing for the Petitioner.

In the context of an ineffective assistance claim based upon counsel's failure to investigate, this court must determine whether counsel exercised a "reasonable professional judgment." Wiggins v. Smith, 539 U.S. 510, 522-23 (2003). Therefore, we must determine "whether [a] reasonable professional judgment supported counsel's decision to forego further investigation of a mental state defense, including requesting a psychological or psychiatric examination of the petitioner." Wilcoxson, 22 S.W.3d at 316 (citing Strickland, 466 U.S. at 691). This court has previously held that:

> Where counsel (1) makes some exploration of the mental history of the [petitioner] but fails to take an obvious and easily available step which would have made such a defense viable, (2) does not produce reasonable tactical reasons for not pursuing further investigation, and (3) raises no other plausible defense, courts may find ineffective assistance of counsel.

Id. at 315 (quoting Sylvester Smith v. State, No. 02C01-9801-CR-00018, 1998 WL 899362, at *22 (Tenn. Crim. App. Dec. 28, 1998)).

The post-conviction court accredited trial counsel's testimony that the Petitioner "did not display any behavior to indicate any defense based upon a mental condition or lack of capacity." The post-conviction court also accredited trial counsel's testimony that he did not investigate the Petitioner's mental history because he felt a mental health defense would conflict with his trial strategy. Trial counsel also worried that if a mental health defense was pursued at trial the jury would be exposed to the Petitioner's lengthy criminal record, which included convictions for armed robbery, assault and battery, and vehicular homicide. This was the same reason why trial counsel allowed the Petitioner's videotaped interview to be played to the jury instead of having the Petitioner testify. Accordingly, we agree with the post-conviction court's determination that trial counsel's testimony at the hearing established that he had "reasonable tactical reasons for not pursuing further investigation."

In addition to having "reasonable tactical reasons for not pursuing further investigation" of a mental health defense, trial counsel was also able to raise another plausible defense. Trial counsel testified that his defense strategy was to establish that Ms. Reilly killed the victim and to minimize the Petitioner's involvement in the crime. To that end, trial counsel focused his defense upon the Petitioner's statement that Ms. Reilly struck the victim in the head with a skillet. Trial counsel's defense was not only plausible but somewhat successful because the Petitioner was convicted of the lesser-included offense of second degree murder rather than the charged offense of premeditated first degree murder. Therefore, we conclude that trial counsel's decision to forego further investigation of a possible mental health defense was supported by a reasonable professional judgment.

This court has previously held that the "mere possibility of success based on a defense for which there existed little or no evidentiary support is not enough to establish constitutionally inadequate counsel." Wilcoxson, 22 S.W.3d at 317 (quoting Long v. Krenke, 138 F.3d 1160, 1162 (7th Cir. 1998)). In order for a defendant to establish a viable mental defect defense theory, the defendant must present "psychiatric evidence that [he] lacks the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged." State v. Hall, 958 S.W.2d 679, 689 (Tenn. 1997). To that end, this court has previously held that to successfully bring a claim for ineffective assistance of

counsel due to a failure to present mental health defense, a petitioner must establish that he suffered from a mental disease or defect at the time of the commission of the underlying offense. See Scott M. Craig v. State, No. E2005-02359-CCA-R3-PC, 2006 WL 2161806, at *6 (Tenn. Crim. App. Aug. 2, 2006), perm. app. denied, (Tenn. Nov. 13, 2006); Christopher Duwan Robertson v. State, No. M2004-00556-CCA-R3-PC, 2005 WL 901132, at *4 (Tenn. Crim. App. Apr. 19, 2005), perm. app. denied, (Tenn. Oct. 17, 2005).

In the present matter, the Petitioner has offered no evidence that he lacked the capacity to form the mens rea for second degree murder at the time of the offense. Dr. Young testified that he had never examined the Petitioner and that he could not determine if the Petitioner suffered from a mental disease or defect at the time of the murder.[3] Dr. Young specifically testified that he could not determine the Petitioner's mental state based upon the medical records he had reviewed. We agree with the post-conviction court's conclusion that Dr. Young's testimony was "purely speculative" and did "not even support his assertion." While there was a diagnosis by Dr. Radford that the Petitioner suffered from "major depression with psychotic features," that diagnosis was made eight months prior to the murder. The majority of the Petitioner's medical records were dated several years prior to the murder. Furthermore, the Petitioner himself testified at the post-conviction hearing that he knew what he was doing when he struck the victim and that he knew what he did was wrong and a crime. Because the Petitioner failed to establish that he was suffering from a mental disease or defect at the time of the offense, we conclude that trial counsel was not ineffective for failing to further investigate the Petitioner's mental condition.

## II. Other Issues Raised in the Petition

The Petitioner raised several other issues in his pro se and amended petitions for post-conviction relief. The Petitioner's amended petition claimed that essentially every aspect of trial counsel's representation amounted to ineffective assistance of counsel. "Review generally will extend only to those issues presented for review." Tenn. R. App. P. 13(b). We conclude that all issues not raised in the Petitioner's brief have been waived. See Tenn. R. App. P. 13(b), Advisory Comm'n Cmts. (providing that "review will typically extend only to the issues set forth in the briefs" and that this court's discretion to review issues not raised in the briefs is to "be sparingly exercised").

---

[3] The Petitioner argues that he should not be faulted for failing to present a "more extensive medical review" because there is no funding provided for an indigent petitioner to secure a mental health expert for post-conviction proceedings. However, after "careful consideration of the cases and constitutional provisions" our supreme court has held that "the state is not required to provide expert assistance to indigent non-capital post-conviction petitioners." Davis v. State, 912 S.W.2d 689, 696-97 (Tenn. 1995).

In addition to the mental health issue, the Petitioner raised three other issues in his brief: (1) that trial counsel was ineffective for failing "to consult with a pathologist" regarding the victim's cause of death; (2) that trial counsel was ineffective for failing "to properly preserve an objection to the exclusion of material testimony that was beneficial to the [Petitioner's] case"; and (3) that trial counsel was ineffective for failing "to make a contemporaneous objection to hearsay testimony that implicated [the Petitioner]." However, the Petitioner does not cite to any legal authorities regarding these issues and makes no argument beyond a conclusory one-paragraph statement that trial counsel was ineffective regarding these matters. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); see also State v. Sanders, 842 S.W.2d 257, 260-61 (Tenn. Crim. App. 1992). Accordingly, we conclude that the Petitioner has waived appellate review of these issues.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-12-