IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 4, 2015

## RICHARD HERRERA v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Obion County**
**No. CC-12-CR-106    Jeffrey W. Parham, Judge**

**No. W2014-02458-CCA-R3-PC  -  Filed September 30, 2015**

The Petitioner, Richard Herrera, appeals the Obion County Circuit Court's denial of his petition for post-conviction relief from his 2010 convictions for sexual battery and attempted sexual battery and his effective one-year sentence. The Petitioner contends that he received the ineffective assistance of counsel. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

Joseph P. Atnip (on appeal), District Public Defender; J. Brent Bradberry (at post-conviction hearing), Dresden, Tennessee for the appellant, Richard Herrera.

Herbert H. Slatery III, Attorney General and Reporter; Tracy L. Alcock, Assistant Attorney General; Thomas A. Thomas, District Attorney General; and James T. Cannon, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

In 2010, the Petitioner was convicted of sexual battery, attempted sexual battery, attempted unlawful photographing, and unlawful photographing. He appealed his convictions, and this court affirmed the convictions for sexual battery and attempted sexual battery, reversed and dismissed the photographing convictions, and summarized the facts of the case as follows:

At trial, Nikki Calhoun testified that she was shopping for medicine at Walmart with her boyfriend on July 10, 2009, when she encountered the defendant. She said that while her boyfriend ran back to the car for a moment, she stayed in the store looking at the medicine. Ms. Calhoun testified that she

felt someone behind her in the aisle, so she moved over. When she moved over, someone grabbed her buttocks. Ms. Calhoun said that she did not know what to do, so she just stood still for a moment. The person turned towards her and pointed to something on her shirt. He told her that she had something on her shirt and moved towards her. She testified that she stepped back, but the person continued moving towards her "like he was still going to try and grab" her breast. She said that he walked away when she continued to step back and that he never touched her chest. Ms. Calhoun stayed in the aisle until her boyfriend returned. She said that she was upset and crying. She told her boyfriend what had happened and insisted that they leave the store. Ms. Calhoun identified the defendant as the person who grabbed her buttocks that day.

Ms. Calhoun further testified that she encountered the defendant again at the same Walmart on August 14, 2009. She said that she was in the grocery section when she saw someone behind her in her peripheral vision who "looked like he was trying to take a picture." She said that she reached down to grab a box from a shelf and saw the person "bent down with his phone up [her] skirt." She turned around and looked at the person, who told her, "'Oh, we must have been looking at the same thing.'" She identified the defendant as the person who had his phone under her skirt. Ms. Calhoun said that they both walked away at that point. She saw him walk out of the store, and she went to the store's restroom because she was crying. A store employee in the restroom asked her whether she was okay, and she told the employee what happened. The employee said that they needed to contact the police.

The police arrived, and she spoke with a patrol officer. She later spoke with Union City Police Investigator Susan Andrews. Ms. Calhoun testified that district attorney showed her a video taken from the defendant's house. She said that she recognized herself in the video and that it was embarrassing to her.

Tammie Winchester testified that she was the asset protection coordinator for the Walmart store in Union City, Obion County, Tennessee. She testified that on August 14, 2009, someone informed her that a woman had reported being assaulted in the store, and officers had requested video of the incident. Someone had already found the subject, later identified as the defendant, on the store's surveillance video, and Ms. Winchester used the video to discover that the defendant had cashed a payroll check at the store. She connected the time he cashed the check with the electronic records of the cash register and retrieved the check from the register drawer. The check bore

the defendant's name. Ms. Winchester testified that the surveillance video from August 14 did not show the incident that Ms. Calhoun reported, but Ms. Winchester and Ms. Calhoun went through the store's video of July 10, 2009, and discovered that the incident that occurred that day had been recorded.

Union City Police Investigator Derrick O'Dell testified that he executed a search warrant at the defendant's home and found a silver HP camera with a memory card. Investigator O'Dell discovered a video saved on the memory card labeled "Up Skirt – Black Thong." The state played the video for the jury. Investigator O'Dell testified that the video showed the victim, and the audio portion of the video was someone saying, "[S]orry[,] we're looking at the same stuff."

Union City Police Investigator Susan Andrews testified that she interviewed the defendant after advising him of his *Miranda* rights. She said that the defendant told her "that if [she] had him on video, he guessed that he had done it and that he had been taking medication and [did not] remember it, but he was sorry, and he wanted to know if there was anything he could do to get out of it."

The defendant testified that he moved to Obion County from California for work. He said that his father had been a professional photographer and that he had grown up around photography. The defendant testified that he always had his camera with him and that he took pictures of "everything." As examples, he listed food, his house, squirrels, and dirt as subjects of his photography. When asked why he would photograph the victim's bottom, he said that he could not give a reason other than that he had "a compulsive disorder." The defendant testified that there was "nothing sexual . . . with these picture takings at all whatsoever." He explained that he had been "under a battery of medications from a couple of different injuries . . . which did obviously cloud [his] judgment." The defendant said that "at the time, [he] really didn't feel [he] was doing anything wrong or against the law or offending anybody." He testified that the victim might have bumped into him, but he "did not have any intent to touch, grab, offend, squeeze . . . nothing like that." Concerning the attempted sexual battery charge, the defendant said that all that he did was point out that the victim had something on her shirt, which he thought might have been a spider. The defendant testified that when he took the video of the victim's bottom on August 14, 2009, he was "off kilter" and did not feel that he was doing anything wrong at the time. He testified that a doctor in California had diagnosed him as obsessive compulsive but did not

-3-

prescribe medication because the doctor was unsure how medicine for obsessive compulsive disorder would affect his pre-existing Tourette's Syndrome.

*State v. Richard Alexander Herrera*, No. W2010-00937-CCA-R3-CD, 2011 WL 4432895, at *1-2 (Tenn. Crim. App. Sept. 23, 2011).

The Petitioner filed a petition for post-conviction relief, which was summarily dismissed by the post-conviction court because the Petitioner's sentence had expired. On appeal, this court reversed the summary dismissal and remanded for an evidentiary hearing. *See Richard Herrera v. State*, No. W2012-02229-CCA-R3-PC, 2013 WL 4080989 (Tenn. Crim. App. Aug. 9, 2013). On remand, the post-conviction court summarily dismissed the petition for failure to state a colorable claim, and this court again reversed and remanded for an evidentiary hearing. *See Richard Herrera v. State*, No. W2013-02064-CCA-R3-PC, 2014 WL 1410294 (Tenn. Crim. App. Apr. 9, 2014). After the evidentiary hearing, the post-conviction court denied post-conviction relief.

In the present appeal, the Petitioner's sole contention is he received the ineffective assistance of counsel due to trial counsel's failure to request a mental health evaluation before the trial. Our recitation of the testimony at the evidentiary hearing will be confined to this issue.

At the hearing, trial counsel testified that at the time he represented the Petitioner, he had twenty-seven years' criminal trial practice experience. Counsel said he met with the Petitioner about six times before the trial, which included preparing for the trial. He said that throughout trial preparation, the Petitioner claimed he was innocent but that three or four days before the trial, the Petitioner told counsel he had been diagnosed with Tourette's syndrome by a doctor in California "or maybe [the doctor] suggested that he had it." Counsel told the Petitioner that counsel needed to obtain the Petitioner's medical records. Counsel said the Petitioner told him that the Petitioner would obtain the doctor's name but never provided it. On the morning of the trial, the trial court denied counsel's request for a continuance to investigate the Petitioner's mental health. Counsel denied that the Petitioner told him about having Tourette's syndrome earlier in the representation.

Trial counsel testified that he "got along great" with the Petitioner and that he "didn't have any trouble with [him]." He said that the Petitioner was very intelligent and had an intellectually demanding job in California and that counsel had no reason to believe the Petitioner had "any kind of mental incapacity."

-4-

Trial counsel acknowledged that during the motion for new trial hearing he told the trial court

> . . . when [the Petitioner] first went into the jail he had some episodes out there that were bizarre and unusual, and he advised me about those. He was seeing things on the wall and things in the air, and I investigated that when he advised me of that, and I thought that maybe he might have some type of mental problem at that time, but when I investigated that with the people out at the jail to ask them what was going on and what was happening, I got a different view of that. And then after he was released from jail, he had no further problems with that kind of behavior for several months between the time of release from jail and the trial, so I didn't think that I could pursue that, really, and make it work, so I did not go that way.

Trial counsel said, "Whenever I talked to the jail people, they all acted like, well, he was making it up, trying to get out of jail, trying to be crazy . . . then, in my office I never saw anything like that[.]" Counsel said he never saw a Regional Organized Crime Information Center (ROCIC) submission form completed by Detective Susan Andrews that categorized the Petitioner as "mentally disturbed."

Trial counsel acknowledged that in his closing argument at the trial he said, "I don't know if [the Petitioner is] insane, but he's not like we would perceive with a person acting normally." Counsel made the statement because "normal people don't take pictures of women under their dress." When asked whether counsel felt it appropriate to request a mental evaluation for the Petitioner, counsel responded, "No. People who commit crimes are not crazy." Counsel said that although the Petitioner told him about the Tourette's syndrome diagnosis two or three days before the trial, the Petitioner failed to provide the physician's name. Counsel requested a mental evaluation after the trial but before the sentencing hearing, but the motion was denied.

The Petitioner testified that during one of the early meetings with trial counsel, they discussed a possible defense based on the Petitioner's Tourette's syndrome diagnosis. The Petitioner said counsel "explained that he would look into and secure an expert witness for trial." The Petitioner said that he could not remember the substance of his other meetings with counsel, except that counsel "push[ed] . . . [him] to accept" the State's plea offer. The Petitioner said that at one of the last meetings, counsel told him no expert witnesses were going to testify, but they were going to proceed to the trial "with what we've got." The Petitioner said that he "was caught off-guard." The Petitioner stated that he "would have shared [the information he] had available had [counsel] asked for medical information" but

that he saw different doctors and did not have their contact information accessible on demand.

The Petitioner testified that two women were involved in the incidents at Walmart. He said that the victim who testified at the trial was only involved in the August 14 incident. He remembered that the other woman was shorter than the victim who testified. The Petitioner said that at the trial, the victim who testified had dyed her hair to match "the lady in the video from July 10th" and that the victim who testified lied when she said she was the woman in the July 10 Walmart recording.

Trial counsel, recalled by the State, testified that the Petitioner told him early in the representation that he had obsessive compulsive disorder (OCD). The Petitioner's compulsive behaviors included flipping light switches and taking "thousands of pictures of just anything[.]" Counsel said he attempted to explain the Petitioner's compulsions to the jury. Relative to the Petitioner's contention that two women were involved, counsel said,

> [H]e said something about this lady is not the first lady, she's dyed her hair to look like the first lady. And I thought, [that doesn't] make sense. . . . [H]ow am I going to explain that to anybody, because how would she even know what to dye her hair to look like somebody that she doesn't even know?

The post-conviction court denied relief. The court found that although the Petitioner's OCD was used as a defense to the photograph-related charges at the trial, the "Petitioner did not explain or offer proof as to how [OCD] could be a defense to the Sexual Battery charges, nor did he show such a condition would have changed the outcome of the trial." The court concluded that the Petitioner failed to prove by clear and convincing evidence that he received the ineffective assistance of counsel.

On appeal, the Petitioner contends that he received the ineffective assistance of counsel because trial counsel failed to request a mental health evaluation before the trial.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is

subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). One of counsel's duties in preparing for a trial is "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland v. Washington*, 466 U.S. 668, 691 (1984). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The Petitioner argues that trial counsel knew of the Petitioner's mental health issues because the Petitioner told counsel about his hallucinations, insisted there were two victims, and claimed the testifying victim had changed her appearance to look like the other victim, whom she had never met. The Petitioner argues counsel's knowledge of his mental health issues was shown by counsel's mentioning insanity during the closing argument. The

Petitioner further argues counsel provided deficient performance because counsel relied upon jail personnel's opinions that the Petitioner was "faking" his hallucinations, improperly concluded the Petitioner did not have mental health issues, and failed to discover the ROCIC form labeling the Petitioner as mentally disturbed.

The Petitioner relies, in part, upon *Becton v. Barnett*, 920 F.2d 1190, 1193 (4th Cir. 1990), to support his argument that a "lawyer is not entitled to rely on his own belief about a defendant's mental condition, but instead must make a reasonable investigation." The Petitioner argues that had counsel obtained an expert witness for the trial, it "might well have afforded [the Petitioner] a good possibility" of negotiating a plea agreement to a reduced charge or the jury convicting him of a lesser included offense of sexual battery.

As a preliminary matter, the record reflects that trial counsel had not seen the ROCIC submission form before the trial. The sentencing hearing transcript reflects, though, that counsel had general knowledge of the ROCIC system at the time of sentencing. Counsel cross-examined Investigator Derrick O'Dell at the sentencing hearing relative to the ROCIC system and its use in reporting the Petitioner's prior criminal history. However, no evidence was presented at the post-conviction hearing that counsel knew about the form related to the Petitioner before the trial. As a result, we cannot conclude that counsel's performance was deficient in regard to the ROCIC form because the Petitioner failed to prove by clear and convincing evidence counsel knew or should have known of its existence.

The record reflects, however, that trial counsel's performance was deficient in other respects. Relative to counsel's duty to investigate the Petitioner's mental health, this court has concluded that courts may find ineffective assistance of counsel

> Where counsel (1) makes some exploration of the mental history of the appellant but fails to take an obvious and easily available step which would have made such a defense viable, (2) does not produce reasonable tactical reasons for not pursuing further investigation, and (3) raises no other plausible defense[.]

*Wilcoxson v. State*, 22 S.W.3d 289, 315 (Tenn. Crim. App. 1999) (quoting *Sylvester Smith v. State*, No. 02C01-9801-CR-00018, 1998 WL 899362, at *22 (Tenn. Crim. App. Dec. 28, 1998)).

*Wilcoxson* was a capital case in which mental health status might have had an outcome-determinative effect on the petitioner's sentence. The petitioner argued that he received the ineffective assistance of counsel when trial counsel, a team of two lawyers, failed to "adequately investigate the petitioner's competence to stand trial and the feasibility

of an insanity defense or a claim of diminished capacity." *Wilcoxson*, 22 S.W.3d at 294. The petitioner presented evidence of mental health diagnoses, including bipolar mood disorder and a schizo-affective disorder for which he took antipsychotic medications. *Id.* at 297-99. Multiple mental health professionals testified at the post-conviction hearing and mental health records from a federal prison, a psychiatric center, and the Department of Correction were received as exhibits. *Id.*

In *Wilcoxson*, trial counsel had knowledge of the petitioner's extensive mental health record, but because the petitioner was active in preparing his case and was adamant that he did not want a mental health evaluation or insanity defense, counsel did not request a mental health evaluation or further investigate the petitioner's mental health. *Id*. at 301. One of the Petitioner's defense attorenys testified that the petitioner was intelligent and a certified federal jailhouse lawyer and that in counsel's opinion, any mental health diagnosis was based on the petitioner's manipulation skill. The attorney said, "I think [the petitioner] is a lot smarter than anyone who interviewed him or would have treated him, and he is a lot more tenacious and I think his ability to stay with a plan of action is beyond anything that they comprehend." *Id.* at 310. Counsel also testified, however, that they received reports of the petitioner throwing feces and bodily fluids at guards and inmates and that the petitioner told them he practiced mind control. *Id.* at 313-14.

The *Wilcoxson* court concluded that trial counsel should not have conformed the defense theory to the petitioner's wishes until competency was determined and that counsel should not have relied on a personal assessment of the petitioner's competency without undertaking further investigation given the known information relative to the petitioner's mental illness. *Id.* at 315-17. This court also concluded that because the petitioner did not present evidence showing that he was incompetent or suffering from diminished capacity at the time of the offense, however, he failed to establish prejudice. *Id*. at 315-317.

In the present case, the Petitioner advised trial counsel of his hallucinations while in jail, and counsel relied upon the opinions of jail personnel that the Petitioner was "faking it." Counsel's reliance on the mental health assessment by correctional officers did not negate counsel's duty to investigate the Petitioner's mental health further. *See Wilcoxson*, 22 S.W.3d at 315-17. Counsel, who was not a trained mental health professional, was not entitled to rely on his own assessment of the Petitioner's mental health in light of counsel's learning early during the representation of the Petitioner's hallucinations and OCD. Counsel's decision not to investigate further was deficient performance.

The post-conviction court found that "two to three days before trial, Petitioner wanted to argue that he had a mental condition; specifically Tourette's Syndrome and Obsessive-Compulsive Disorder." The record reflects, however, that trial counsel had knowledge about

the OCD and the Petitioner's hallucinations before the Petitioner mentioned his Tourette's syndrome diagnosis shortly before the trial. At the post-conviction hearing, counsel testified

> Tourette's Syndrome was never mentioned to me till just a few days before [the trial] . . . What was mentioned to me was [the Petitioner] told me, "I've got OCD, obsessive compulsive disorder." He said I flip light switches on and off a thousand times a day, I wash my hands a thousand times a day, I take thousands of pictures of just anything and everything. He said, I just have a compulsiveness to do this stuff . . . I tried to tell the jury, you know, this guy's got compulsion to take pictures . . . I was trying to explain taking the pictures.

The record reflects that trial counsel's defense theory centered on the Petitioner's compulsive behaviors to show that the Petitioner was not taking photographs for sexual gratification, but rather as a result of a compulsion he could not control. During the opening statement, counsel discussed OCD in detail. Counsel did not raise any other defenses. We conclude that the evidence preponderates against the post-conviction court's determination that counsel's failure to investigate the Petitioner's mental health was not deficient.

Relative to the question of prejudice, the Petitioner did not present any expert testimony at the post-conviction hearing regarding his mental health. This court has concluded that when a petitioner claims counsel was ineffective by failing to present a witness at a trial, a petitioner generally cannot establish prejudice without presenting that witness at the post-conviction hearing. *Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990) (concluding that a post-conviction petitioner should produce a material witness "who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called" to establish his claim). As a result, the Petitioner has failed to establish he was prejudiced by trial counsel's failure to request a mental health evaluation.

Alternatively, the Petitioner argues that he qualified for a narrow exception in which ineffective assistance can be proven without showing prejudice. *See Wallace v. State*, 121 S.W.3d 652, 658 (Tenn. 2003). In *Wallace*, the defendant's trial counsel neglected to withdraw as counsel of record after the trial and did not file a motion for new trial. *Id.* at 655. As a result, the defendant was not permitted to file a pro se motion for new trial, and his claims on appeal were waived except for sufficiency of the evidence. *Id.* Our supreme court held that proving prejudice was not necessary to prove the ineffective assistance of counsel when counsel "abandon[ed] . . . his client at such a critical stage of the proceedings [that it resulted] in the failure to preserve and pursue the available post-trial remedies and the complete failure to subject the State to the adversarial appellate process." *Id.* at 658.

-10-

The Petitioner's reliance on *Wallace* is misplaced. In *Wallace*, trial counsel abandoned his client, and the abandonment served as a roadblock to appellate relief. In the present case, the Petitioner sought and received appellate relief on the merits. We cannot conclude that counsel's deficiency was so fundamental as to "fail[] to subject the State to the adversarial appellate process." *Wallace*, 121 S.W.3d at 658. We note this court vacated two of the Petitioner's convictions, reflecting that the State was subjected to the full appellate process. We also note that at the sentencing hearing, the following exchange occurred between the Petitioner and counsel:

> Q. . . . I've asked you this question before and I'm going to ask you in front of this Court: Do you have any explanation for what made you take pictures under these women's dresses?
>
> A. [Counsel] and the Court, no, I don't. And as I said several times before, I have no explanation . . .
> . . .
>
> Q. . . . [W]e had tried to look at reasons during the trial why you were doing something like this . . . we tried to think of reasons that would excuse it or at least give some reason for doing it, and you were telling me about some problems you'd had in the past, but they really didn't amount to anything that would explain it, did they, the medical problems you were alleging?
>
> A. At this point, I would agree, yes.
>
> Q. All right. And I had filed . . . I saw where you would be allowed a mental evaluation if that were something we wanted to pursue, and I've asked for that, but we're not asking for that today?
>
> A. I understand that.
>
> Q. And we're withdrawing that motion totally?
>
> A. Uh-huh. Correct.

The Petitioner admitted under oath that his mental health issues were not the cause of his unlawful behavior. The Petitioner has not shown that counsel's deficiency was so fundamental that prejudice must be presumed. The Petitioner is not entitled to relief.

The judgment of the post-conviction court is affirmed.


_____
ROBERT H. MONTGOMERY, JR., JUDGE